## ST. LOUIS, MEMPHIS & SOUTHEASTERN RAILROAD COMPANY, Appellant, v. AUBUCHON.

Division One, November 21, 1906.

1. **CONDEMNATION: Payment and Acceptance of Commissioners' Award: Trial, Nevertheless, Before Jury.** Where commissioners have been appointed to assess the landowner's damages due to the appropriation of a right of way through his land, and they have fixed the amount thereof, and the railroad excepts to the award, but subsequently pays the amount thereof into court and takes possession of the right of way, and the landowner accepts the amount of the award and takes down the money, the railroad is not thereby precluded from having the damages settled by a jury trial, nor is the court thereby deprived of jurisdiction over the subject-matter.

2. ———: **Practice: Limiting Number of Witnesses: Forewarning.** An arbitrary rule limiting the number of witnesses to a side in a damage suit upon the issue of damages or no damages, is arbitrary and unreasonable. Much less can such a rule be defended when the rule is made and applied after three witnesses have been placed on the stand by plaintiff.

3. ———: **Independent Tracts: Joint Owner and Uses: Island and Shore Land.** Two independent farms, belonging to the same owner but held by separate chains of title, subjected to independent and distinctly separate uses, are not to be considered

in the assessment of damages for the condemnation of a strip of one of them. And where defendant owned an island described as being "in the Mississippi river," which was afterwards extended and enlarged by accretions, and afterwards bought a farm opposite thereto, on the shore, a channel of the river being between them, sometimes almost dry, but often the water therein being from 100 to 200 yards wide, and at such times crossed by a ferry boat, no joint uses having ever been made of them, although it is claimed the shore farm might be used for pasturing cattle and feeding them with corn raised on the island, there is no such continuity as permits any depreciation in the value of the island to be considered when damages are being assessed in a condemnation case for a strip of land, near the shore, taken from the shore farm for a right of way for a railroad.

Appeal from Ste. Genevieve Circuit Court.—*Hon. Robt. A. Anthony,* Judge.

REVERSED AND REMANDED.

*L. F. Parker* and *John G. Egan* for appellant.

(1) To constitute a body of land a single tract, for the purpose of assessing damages to the entire tract on account of the taking of a right of way thereupon for a railroad company, the tract must have been used in common for a single joint purpose before the condemnation proceedings, and if such unity of use has not existed, damages should not be allowed to the entire tract. Railroad v. Doran, 15 Minn. 230; White v. Railroad, 154 Ill. 620; Sharp v. U. S., 191 U. S. 341; Railroad v. Wilkins, 45 Kan. 674; Gibson v. Fifth Av. Bridge Co., 192 Pa. St. 55; Railroad v. Norcross, 137 Mo. 415; Lake Ry. & Nav. Co. v. Xavier Realty, 115 La. Ann. 328. And this proposition was assumed in the following three cases: U. Elev. Co. v. Railroad, 135 Mo. 353; Reisner v. Railroad, 27 Kan. 382; H. B. Co. v. Schaubacher, 57 Mo. 582. (2) An intention to use a tract of land in common in the future will not make it a single tract for the purpose of assessing damages on

199 Sup.—23

account of the condemnation of a railroad right of way thereupon. The land must already have been devoted to a single use, and the plan or intention to devote it to a single use will not constitute it a single tract. White v. Railroad, 154 Ill. 620; Peck v. Railroad, 38 Minn. 343; Gibson v. Fifth Av. Bridge Co., 192 Pa. St. 55; Goodwine v. Evans, 134 Ind. 262; Lake Ry. & Nav. Co. v. Xavier Realty, 115 La. Ann. 328. (3) Where a strip of land owned by a third party in fee divides a tract, damages cannot be obtained to the entire tract on account of the condemnation of a railroad right of way upon one part of it. Cameron v. Railroad, 42 Minn. 75; Railroad v. Littler, 79 Pac. 114; Lake Ry. & Nav. Co. v. Xavier Realty, supra. (4) The bed of a river is the part which shows the usual effect of water, and by the character of the soil, and whatever vegetation may spring up thereupon, is distinguished from the banks and the land back of the banks. Railroad v. Ramsey, 53 Ark. 314; Howard v. Ingersoll, 54 U. S. (13 How.) 381. (5) Low water mark is the boundary made by water at its ordinary low stage, and not the edge of the water at an extraordinarily low stage. McBurney v. Young, 67 Vt. 574; Kentucky Lumber Co. v. King, 23 Ky. Law Rep. 1422; Stover v. Jack, 60 Pa. St. 339. (6) A riparian land owner does not acquire title to an island which springs up in the river opposite his land. Cooley v. Golden, 117 Mo. 33; Crandall v. Smith, 134 Mo. 633; Moore v. Farmer, 156 Mo. 33; Stover v. Jack, 60 Pa. St. 339. (7) It is an abuse of discretion for a court on a controverted question of any importance, and particularly on the principal question in a case where much is involved, to limit the number of witnesses on a side to four. Nelson v. Wallace, 57 Mo. App. 397; Fenwick v. Bowling, 50 Mo. App. 516; State v. Whitten, 68 Mo. 91; White v. Hermann, 51 Ill. 243; Railroad v. Matula, 79 Tex. 580; Underhill on Evidence, sec. 381; Markham v. Herrick, 82 Mo. App. 327. (8) Where the court limits the number of witnesses on

a side, it should so notify the parties before the intro-
duction of any testimony.    Markham v. Herrick, 82
Mo. App. 327; Green v. Ins. Co., 134 Ill. 310.

*Pipkin & Swink* for respondent.

(1)   (a)   The damages to which defendant is en-
titled is the difference between what was the fair
market value of the whole tract before, and what its
value will be after the appropriation, in view of the
uses to which the land appropriated is adapted.   Welsh
v. Railroad, 19 Mo. App. 127; Railroad v. Baker, 102
Mo. 553; Railroad v. McGrew, 104 Mo. 282; Railroad v.
Valcins, 90 Mo. 538; 10 Am. & Eng. Ency. Law (2 Ed.),
1103, 1164; Mississippi River Bridge Co. v. Ring, 58
Mo. 491; Lewis on Em. Dom., sec. 479.   (b)   It has been
held proper for a jury to consider "all incidental loss,
inconvenience and damages, present and prospective,
which may be known or may reasonably be expected to
result from the construction and operation of the road
in a legal and proper manner."   Lewis on Em. Do-
main, sec. 480a; 10 Am. and Eng. Enc. Law (2 Ed.),
1169, 1170; Railroad v. Story, 96 Mo. 622; Railroad v.
Dawley, 50 Mo. App. 480.   (c)   It seems that even in
those cases where a remedy is provided for injuries
caused in the operation of the road, yet such injuries
should be taken into account in assessing damages
where a part of a tract is taken in condemnation pro-
ceedings in so far as they tend to depreciate the value
of the remainder.   Mathews v. Railroad, 121 Mo. 338;
Railroad v. McGrew, 104 Mo. 294; Lewis on Em. Do-
main, sec. 497; Mills on Em. Domain, secs. 163, 166.
(d)   Parcels of land used and cultivated as a unit, al-
though separated by a road, a canal, or a county line,
are considered a single tract, damages to which must
be taken into consideration by the commissioners.
Lewis on Em. Domain, sec. 475; 10 Am. and Eng. Ency.
Law (2 Ed.), 1166; Railroad v. Waldo, 70 Mo. 629;

Bridge Co. v. Schubacher, 57 Mo. 582; Railroad v. Norcross, 137 Mo. 415; U. Elev. Co. v. Railroad, 135 Mo. 415. (e) The tendency of late is toward a more liberal allowance of consequential damages than formerly. 10 Am. and Eng. Ency. Law (2 Ed.), 1106. (2) Denying that the court erred in limiting the number of witnesses as to the question of damages to four on each side, and denying further that there was any unfairness shown or resulted, respondent asserts that since this point was not preserved in appellant's motion for new trial, it will not for that reason be considered by this court. Standard Milling Co. v. Railroad, 122 Mo. 258. (3) When the company takes the land and the land-owner takes the money without excepting, can the railroad company file its exceptions and have them heard against the consent of the land-owner? Const. 1820, art. 13, sec. 7; Const. 1865, art. 1, sec. 16; Wag. Stat. p. 327, sec. 314; State v. Dickson, 3 Mo. App. 466; State v. Lubke, 15 Mo. App. 164; Ring v. Bridge Co., 57 Mo. 498; Const. 1875, art. 2, sec. 21; secs. 1266, 1268, R. S. 1899; 10 Am. and Eng. Ency. Law (2 Ed.), 1050; Black's Const. Law, p. 259; Musick v. Railroad, 114 Mo. 309; Chouteau v. Railroad, 122 Mo. 375. (4) (a) The general rule is that private property can not be taken for public use until compensation is actually paid or tendered. 10 Am. and Eng. Ency. Law (2 Ed.), 1137; Walther v. Warner, 25 Mo. 277; Bradley v. Railroad, 91 Mo. 493. (b) Since a citizen is entitled as an individual to the enjoyment of his property, and the disposal of it on his own terms, and the exercise of the right of eminent domain is in derogation of these rights, and can be justified only on the ground of necessity, the power of depriving him of it, even with payment at an estimate fixed by others, is most extraordinary, and the right should be construed with the greatest strictness. Ellis v. Railroad, 51 Mo. 200; State v. Farelly, 36 Mo. App. 282; Belcher Sug. Ref. Co. v. St. L. G. El. Co., 82 Mo. 121; Thompson v. Railroad,

110 Mo. 147; Railroad v. Clark, 119 Mo. 357. (c) A corporation in the exercise of the right of eminent domain can not take possession of the condemned land until the damages assessed have been paid to the owner or into the court for him. State v. Lubke, 15 Mo. App. 161; Snyder v. Cowan, 50 Mo. App. 436; Railroad v. Clark, 119 Mo. 357. (d) When constitutions fix the time of payment legislatures are powerless to change the time. 2 Lewis, Em. Domain, sec. 454. (e) Where the amount awarded by the commissioners has been paid into court for the owner, title to said money passes at once to the land-owner. Snyder v. Cowan, 120 Mo. 389; Railroad v. Eubanks, 130 Mo. 272. This case overruled the Evans & Howard case in 85 Mo. 307; State v. Lubke, 15 Mo. App. 152; Railroad v. Clark, 119 Mo. 357. (f) If after payment of the award into court for the land-owner, the land-owner takes the money without excepting, and the railroad company takes possession of the land, although excepting to the report of the commissioners, it operates as a finality, and the exceptions will be stricken from the record on proper motion. State v. Lubke, 15 Mo. App. 155. Wherever the question has presented itself for adjudication it has invariably turned on the other question of whether or not the payment required was one without reservation or was a mere deposit *pendente lite;* in those jurisdictions where under the constitutional provisions the payment into court was without reservation, the courts have held that it operated as a finality. Neily v. Zurmehly, 23 Ohio St. 631; Wagner v. Railroad, 10 Am. & Eng. Ry. Cas. 384; State v. Lubke, 15 Mo. App. 153, approved in Snyder v. Cowan, 50 Mo. App. 436.

LAMM, J.—On October 25, 1901, Narcissus A. Aubuchon purchased a parcel of land described as all of fractional section 11, township 39, range 7 east, containing 56.99 acres lying in Ste. Genevieve county, for $2,000, and entered into possession. Thereafter, on September 5, 1902, the St. Louis, Memphis & Southeas-

tern Railroad Company commenced proceedings in the circuit court of said county to condemn a right of way for a standard gauge railroad through said tract for a distance of 3,145 feet, taking therefor a strip 100 feet wide, containing 7.002 acres of land. On October 11 commissioners, duly appointed and qualified, reported Aubuchon's damages at $7,000 and further reported that plaintiff company should construct a twelve-foot "under-road" crossing for Aubuchon in mitigation of damages claimed. This report was filed October 13th. Plaintiff company paid into court said award and in due time filed exceptions to the commissioners' report. Thereafter Aubuchon accepted and took down the $7,000, and thereafter the court granted a jury trial on the exceptions of plaintiff, to re-assess the damages, and the plaintiff company took possession of the strip to construct its railroad.

Before the assessment of damages by the jury, Aubuchon filed a motion to strike plaintiff's exceptions from the record, which motion was based on the theory that plaintiff had paid into court the said damages and afterwards took possession of the right of way and Aubuchon had received the said sum and did not himself except to the report but accepted the provisions thereof as a final adjustment of the matters set out in plaintiff's petition, and, therefore, the court had no further jurisdiction over the subject-matter of the action. This motion was overruled and Aubuchon excepted to the ruling. The jury awarded Aubuchon $8,000 damages; and, from a judgment upon that verdict, plaintiff after due steps appeals.

I. The first question presented is whether the tender into open court of the commissioners' award, $7,000, and its subsequent receipt by Aubuchon resulted in making the matter a finality and subsequent steps of no account.

Defendant's learned attorneys present an ingenious constitutional argument in favor of their view, and

it may be conceded that, if the question was *res nova,* much might be said, and well said, on that theory. That was the view entertained by the St. Louis Court of Appeals in 1884. [State *ex rel.* v. Lubke, 15 Mo. App. 152.]

But the whole matter was under exposition and elaborately considered in Rothan v. Railroad, 113 Mo. 132, and in Railroad v. Clark, 119 Mo. 357. The constitutional provisions relating to the exercise of the right of eminent domain, the right of trial by jury on the damages assessed and the statutes enacted to give effect to these constitutional provisions, were expounded in those cases and the conclusion arrived at was adverse to the present contention of respondent. Those cases have been taken as settling this question in this State, whatever may be the rule elsewhere, and they have been followed. [Railroad v. Donovan, 149 Mo. l. c. 103, *et seq.;* State *ex rel.* v. Fort, 180 Mo. l. c. 103, *et seq.;* Railroad v. Roberts, 187 Mo. l. c. 319, *et seq.*]

Accepting their authority without re-examining or seeking to disturb the reasoning upon which they rest, it must be held that plaintiff was entitled to deposit the amount of the award in court, and thereby become entitled to take possession of the strip and go on with its work, without losing its right to further litigate with defendant the amount of damages.

For constitutional purposes (sec. 21, art. 2; sec. 4, art. 12) the award of the commissioners (until disturbed) was, *prima facie,* the just compensation to which defendant was entitled before his property was taken. But for statutory and final purposes, just compensation is flexible enough to mean, and does mean, the final amount awarded by a jury on a fair trial (R. S. 1899, secs. 1266, and 1268), and defendant may not preclude plaintiff's right to litigate the question of damages by accepting the commissioners' award and putting the money in his pocket.

The point must, therefore, be ruled against defendant.

II.   Plaintiff assigns error in the exclusion of testimony—the point arising *nisi,* in this way: Having introduced three witnesses on the question of damages, the trial court, during the examination of the third witness on behalf of plaintiff, announced a rule to the effect that each side would be allowed only four witnesses on that issue, and applying the rule to the then condition of plaintiff's proof, allowed only one other witness to plaintiff on that issue.   Plaintiff tendered other witnesses on that issue, but they were excluded.   Plaintiff excepted to the rule when announced and excepted to its application when made.   Subsequently, defendant while putting in his case tendered several witnesses in excess of the number prescribed, but they were not allowed to testify, and the defendant excepted.   Defendant, however, took no appeal and filed no bill of exceptions and, though the ruling was to the mutual dissatisfaction of both parties litigant, yet defendant's discontent was apparently allayed by the verdict, whereas plaintiff's seems to be inflamed thereby.   Thus is Beaumont & Fletcher's *dictum* in *Love's Cure* (Act III, Sc. 2) shown to be well grounded, *viz.*:

> What's one man's poison, signor,
> Is another's meat or drink.

Was the ruling below right?   We think not.   The issue of damages was the main issue in the case.   That trial courts are allowed a discretion ought not to be gainsaid.   The most irritating and unjustifiable delays would arise if trial courts had no discretion, were left to the volatile caprice of counsel alone.

On collateral and incidental issues, as for example the general reputation of a witness, or an issue upon a motion for a change of venue, or for costs, etc., it is a wise and a settled rule to allow trial courts wide discretion; and error predicated upon the exercise of such

discretion should be palpable and manifest to be held prejudicial.

Nor will we lay down any hard-and-fast rule circumscribing the power of trial courts, in the economy of time and dispatch of business, to put some reasonable bounds on the introduction of witnesses on a main issue in a civil suit; especially so where the evidence on a single point is not controverted, or where it is distinctly cumulative in quantity and quality. But evidently the matter should be approached with caution and an arbitrary rule allowing four witnesses to a side in a damage suit upon the issue of damage or no damage can not be defended. Much less can it be defended when the rule is made and applied (as here) after three witnesses have been placed upon the stand by one party. Picking and choosing become a vital matter under such rule and even-handed justice requires that both parties have fair forewarning and the full privilege to pick and choose. This privilege was denied plaintiff and thereby defendant had a distinct advantage; because, after the rule, plaintiff had but one choice, while defendant had four.

But, on principle, the rule was arbitrary and, we think, unreasonable. Defendant's damage might be composed of many elements and one witness might be qualified on one element and another witness on another. Not only so, but there is a great difference between witnesses, and counsel, however wisely they may select, may ride to a fall on a given witness. His manner may be disappointing on the witness stand, his capacity to tell what he knows may have been miscalculated, his voice may lack a note of sincerity, he may not stand the fire of a searching cross-examination, a yawn, a furtive glance of the eye, a shrug of the shoulders, impatient or impertinent remarks, a foolish reason given, or any one of many other supposable lapses or inadvertences may destroy or weaken the value of human testimony, and neither court nor counsel have

the prescience to say in advance that justice will be met by an arbitrary assignment of four witnesses to a side on a controverted question of damages in a cause that would sustain a verdict of $8,000.

We are cited to no case by respondent that sustains such rule. In fact, the theory suggested by respondent upon which the assignment of error should be disallowed is that the motion for a new trial does not cover the point, but we do not read and construe the motion that way, and we think, on both reason and authority, error was committed in making and applying that rule in this case.

In one reported case, involving damages under the exercise of the right of eminent domain (Railroad v. Baker, 102 Mo. 1. c. 563), "sixty odd witnesses were introduced"—the phrase "odd witnesses" in that instance (though not always) referring to number rather than to singularity.

The jury are the sole and exclusive judges of the weight of the testimony; with that the trial court has nothing to do, during the trial. If, then, the trial judge may without any cause shown project his will arbitrarily into the number of witnesses on the crucial point in the case, he may by that token entirely foreclose the weight of evidence, and thus indirectly do what he may not directly do, to-wit, interfere in a realm where the jury reign supreme; and while we would not want to say that a trial judge must supinely and indefinitely sit with folded arms to hear a cloud of witnesses spin out evidence upon the same point, yet there was no such threatened abuse in this case and the precedent established by the learned judge, *nisi*, ought not to be sustained.

There may be conflict in the authorities, but the weight of judicial opinion and the quality of reasoning advanced therefor lie with the view herein expressed. [Railroad v. Matula, 79 Tex. 577; Nelson v. Wallace, 57 Mo. App. 397; Markham v. Herrick, 82 Mo. App.

327; White v. Hermann, 51 Ill. 243; Green v. Ins. Co., 134 Ill. 310; Village of South Danville v. Jacobs, 42 Ill. App. 533; Crane Co. v. Stammers, 83 Ill. App. 329; Cooke Brewing Co. v. Ryan, 98 Ill. App. 446; Barhyte v. Summers, 68 Mich. 341; Ward v. Dick, 45 Conn. 235; Perkins v. Rice, 187 Mass. 28.]

III.  As the cause must be reversed and remanded because of the error pointed out in paragraph two of this opinion, it becomes necessary to consider another assignment of error we deem well made and which error should be avoided on a re-trial.

The consideration of the point now in mind can not proceed intelligently without uncovering certain material facts.  Thus: Fractional section 11, through which the railroad runs, may be called the Wallace tract.  In 1853 there was a small stream emptying in the Mississippi river from the Missouri side called Isle Au Bois, the mouth of which was in section 3 of the same township and range as the Wallace tract, and a mile or a mile and a half north thereof.  At that time there was a small island in the Mississippi river opposite the mouth of Isle Au Bois creek and there was no island, whatever, opposite the Wallace tract. The chain of title under which defendant held the Wallace tract described the same, in some of its links, as being "on the Mississippi river."  At the present time there is an island in the Mississippi river opposite the Wallace tract which projects north of that tract a good ways, the south end being about opposite the south side of the Wallace tract.  In 1895 defendant (who lives elsewhere) acquired this island and ever since has owned and cultivated the same through tenants.  He bought the island for $3,500 and holds title thereto under two deeds of conveyance.  Under one deed the description is as follows:  "The undivided one-half of a certain island in the Mississippi river opposite the mouth of a creek called Isle Au Bois situate partly in section 3, township 39 north, range 7 east, containing at the time

of survey 32.92 acres and also all the accretions to said island which includes what is known as Lee's and Ames' islands, containing in all 700 acres, more or less'' in Ste. Genevieve county, Missouri. The description in the other deed runs the same.

As we understand the case, defendant holds title to said land in the Mississippi river opposite the Wallace tract as *accretions* to the little island shown on the government survey at the mouth of the Isle Au Bois. Whether the original island is still in existence or has been washed away, is not shown by this record, nor does it matter. That the accretions aforesaid would not and did not inure to the benefit of the riparian owner, but were held in a strictly technical sense as accretions to an island, as such, is somewhat shown by the fact that when Wallace, the former owner of the shore land, asserted a right to possession of a certain portion of the land adjacent to him in the river, his right was denied by defendant and he was arrested for interfering with defendant's possessory rights. Having held these accretions as an island (*i. e.,* a piece of land surrounded by water) from 1895 down to September, 1901, defendant, as said, purchased the Wallace tract on the west bank of the Mississippi and, when plaintiff sought to condemn a right of way through the Wallace tract a few months later, he then insisted that the accretions theretofore purchased and held as an island were now, in point of fact and in effect, a part of the main shore, and that, by his purchase of the Wallace tract, the island and the Wallace tract became one entire tract for the purposes of assessing his damages.

The Wallace tract, prior to his purchase and down to the time of the condemnation proceedings, had the appurtenances and characteristics of a small and independent property. There was a little orchard, a perenennial spring that overflowed in high water, a strip of a few acres of tillable second bottom, a refrigerating

cave or "cooler" for milk and suitable for preserving fish or storing fisherman's supplies, pig pens, a little garden and two old and indifferent log houses fit and used for human habitation. These houses in former times were occupied by the then owner of the Wallace tract and his tenants. At the time in hand one of them, as we gather it, was occupied by a tenant of defendant cropping on the Wallace tract, and the other was occupied by a tenant cropping on the island.

Further referring to the Wallace tract, hard by the river was a strip of bottom land that overflowed. Next, on the west, came a narrow bench of second bottom, as aforesaid, above flood water. Next to that, on the west, was a rocky bluff, at some places 100 feet high. A ravine broke this bluff, and at one place widened so as to make a sheltered nook of two or three acres protected on three sides from the winds of winter. Much the greater portion of the Wallace tract lay on and back of the bluff and was broken and untillable, though timbered and suitable for grazing.

Defendant's island had 200 acres of tillable land above high water. At ordinary stages of the river there was considerably more cultivating land. There were also bottoms on this island that overflowed. At other places willows grew and there was also pasturage thereon. The island was divided into fields by fences and there were houses thereon occupied by tenants.

Defendant grew corn on the island and fed and wintered cattle thereon and shipped cattle and corn from the island on steamboats, there being a boat landing provided. The evidence indicated this was the usual shipping point for cattle raised and fed on the island and grain grown thereon. However, there was an interior market now and then at the mines, for instance, Mine LaMotte, and sometimes cattle were driven by defendant there.

Defendant owned, with one Priester, a tract of

land north of the Wallace tract, and there was a road leading to the river through this latter tract to a ford, and at this ford plaintiff maintained a ferry boat.

At very dry times, the water fell so that one could pass to and from the Wallace tract to the island, at least in places, dry-shod. At certain other times, the water there was fordable, the bottom of the channel being sandy. At other times the river re-asserted sovereign rights to that portion of the channel and communication with the island was cut off from the Wallace tract, except by the ferryage aforesaid. When the water was up and covered the low bottom on the Wallace tract and on the adjacent side of the island, *i. e.*, from high bank to high bank, the river was from 100 to 200 yards wide. At low water mark, as said, the bottom of the channel was bare (at least in places), and it seems that the portion of the channel between the Wallace tract and the island and running on up north was locally called a slough, and the bed of this slough from the low land on the island to the low land on the Wallace tract was from 50 to 100 feet wide.

Defendant testified that he bought the Wallace tract to use in connection with the island. His idea was to use the protected feed-lot, as he called it, on the Wallace tract, lying in the little ravine spoken of, to feed cattle which at other times ran on the island, to be watered at said spring. Up to the time of the condemnation, no barns or sheds had been built, nor had any other steps been taken or improvements made to appoint a feed lot there for his island cattle. No crops raised on the island or hay or fodder were usually taken to this sheltered spot or to the Wallace tract and used for feed, or if so taken at all it was only in isolated instances. The Wallace tract could support a few head of cattle by itself, and about that number were fed and wintered there by defendant in the winter of 1901.

The projected right of way ran partly on the low bottom, but mostly on the second bottom of the Wal-

lace tract. At some places there were cuts; at others, fills. At one place the roadbed came to grade. The right of way destroyed the cooler or cave and one log house and, we believe, the orchard. It ran between the improvements on the Wallace tract and the aforesaid spring and took, as said, 7.002 acres of land.

On this record it is contended by plaintiff that the island tract should not have been taken into consideration in assessing damages for taking a strip of the Wallace tract. In other words, plaintiff contends the two tracts were distinct and made so by nature in that a portion of the Mississippi river flowed between. Plaintiff further contends that in a fair sense these two tracts were not subject and put to a joint use; that they did not lie contiguous in contemplation of law; and that defendant's feed-lot on shore, serving as a foundation upon which to build an airy fabric of damages to his island possession, had no real basis in fact or market value in so far as it is taken in connection with the island. Defendant, on the other hand, contends that the island and shore land were one tract, jointly used as such; that plaintiff's right of way cut off the shore feed lot from the island; that the interference with such feed lot, and access therefrom to the spring, injured his island possession, as well as the Wallace tract itself.

It is apparent from the amount of damages allowed by the jury and from the instructions of the court that by far the principal element in defendant's damages is based on the theory of injury to that portion of his real estate lying in the Mississippi river; because, not only did the direct evidence show the damage to the Wallace tract was a few hundred dollars, but of significance in this behalf is the fact that the shore tract cost $2,000 and the evidence showed it was not worth more than that by itself. The island tract, six or seven years before, cost $3,500, making the cost of both tracts $5,500. Now, no valuable or permanent subsequent improvements are shown to enhance the value,

so whatever rise in values existed must be referred to a rising market for real estate. And, considering this, it will be seen that the damages allowed exceeded the total cost of both tracts by $2,500; so that, if both tracts had been wiped out of existence, defendant would (by his $8,000 verdict) be paid his original cost and $2,500 profit in rise of value; yet the fact is, defendant has left his island tract precisely as he bought it and used it, and has further left nearly fifty acres of the Wallace tract, the latter, however, in a concededly damaged condition.

At the hearing plaintiff vainly sought to exclude all evidence pertaining to defendant's island possessions, and saved its exceptions to the rulings of the court. At the close of the whole case it asked an instruction having the same purpose in view. This instruction was refused, and it excepted. Did the court commit error in so ruling? We think so, because:

The correct answer to the foregoing question depends upon the answer to another, viz., were defendant's island and the Wallace tract two separate and distinct farms? Or, were they one body of land or plantation — in effect, contiguous and plainly subject to a joint use? If there was substantial evidence tending to show these two tracts were essentially one body used for a single, i. e., a joint purpose, at the time of the condemnation proceedings, then the theory of the court below was right, and the entirety or oneness of the tracts was an issue for the jury. If, on the other hand, there was no substantial evidence that the tracts were one body of land used for a joint purpose at the time of the condemnation proceedings, then the matter became a question of law and the trial court took the wrong theory of the law.

What is one body of land for the purposes of the assessment of damages under the exercise of the right of eminent domain, in a given case, might be a very simple problem. But complications arise making it a

many-sided problem and very difficult of solution in other cases.

It will be of value in the case at bar to consider some of the elements judicially included, on one side, and judicially excluded, on the other. For instance, it has been held that in the determination of this question mere paper governmental subdivisions into sections, quarter-sections, townships, ranges, etc., amount to nothing in determining the oneness or unity of a tract of land. [Railroad v. Baker, 102 Mo. l. c. 559; Railroad v. Waldo, 70 Mo. 629.]

It has been held that a street or road cutting a tract of land in twain is not a controlling factor where the two tracts thus created have been improved together and used for a single purpose. [Hannibal Bridge Co. v. Schaubacher, 57 Mo. 582; Railroad v. Norcross, 137 Mo. 415; Railroad v. McGrew, 104 Mo. 282.]

A case, Railroad v. Turnbull, 31 Hun 461, will neatly illustrate the last proposition. In that case Turnbull's farm was divided east and west by the Erie Canal. On the north side of the canal was his cultivating land and farm buildings. On the south side his land was hilly and had no buildings. A railroad company sought to acquire title to a strip of his land next to and on the south side of the canal. On this strip was a never-failing spring, the water of which was conducted by a pipe under the canal to the buildings on the north side where it was used for general farm purposes, there being no other source of supply on that side. There was also a farm bridge spanning the canal, connecting the north parcel of Turnbull's land with the south parcel. It was not shown when this pipe was laid or by what authority, but it was there when Turnbull bought the farm, some thirteen years gone, and had been used constantly since without objection from anyone. It was held that in estimating his damages the commissioners properly treated the farm as a whole

199 Sup.—24

and considered its value as increased by the pipe con-
nection under the canal between the spring on the
south side and the buildings on the north.

In considering the problem in hand, another class
of cases must be reckoned with, *viz.*, cases laying stress
upon the fact that an intervening strip of land, the fee
of which is in another, destroys that contiguity, com-
pactness and unity essential to making two tracts one
for the purpose of estimating damages under the exer-
cise of the right of eminent domain. [Railroad v. Wil-
kins, 45 Kan. 674; Railroad v. Littler, 70 Kan. 556;
Cameron v. Railroad, 42 Minn. 75; White v. Railroad,
154 Ill. 620.]

Then, too, there is a class of cases where two or
more tracts of land may be contiguous, or substantially
so, but in which each tract is held by a separate hold-
ing and has been impressed by a distinct and separate
use as substantially independent; for instance, each as
a separate farm, or as a distinct home or tenement in a
city, *etc.*, in which the bare fact of contiguity has not
been allowed controlling force in the assessment of
damages for a strip taken from one of said tracts.
[Railroad v. Doran, 15 Minn. 230; Gibson v. Fifth Ave.
and High Street Bridge Co., 192 Pa. St. 55; Sharp v.
United States, 191 U. S. l. c. 352, *et seq.*]

In the latter case, Justice PECKHAM spoke for the
court, and, in so doing, quoted with approval the fol-
lowing from Judge GRAY, who delivered the opinion of
the Circuit Court of Appeals, and which is not out of
place in the case at bar: ''Depreciation in the value
of the residue of such a tract may properly be consid-
ered as allowable damages in adjusting the compensa-
tion to be given to the owner for the land taken.    It
is often difficult, when part of a tract is taken, to de-
termine what is a distinct and independent tract; but
the character of the holding and the distinction between
the residue of a tract whose integrity is destroyed by
the taking and what are merely other parcels or hold-

ings of the same owner, must be kept in mind in the practical application of the requirement to render just compensation for property taken for public uses. How it is applied must largely depend upon the facts of the particular case and the sound discretion of the court. All the testimony in this case tends to show the separateness of this tract which was the subject of the condemnation proceedings. It had never been farmed or used in connection with either of the other farms owned by the plaintiff in error. It was in no way reasonably or substantially necessary to the enjoyment of the other two tracts. Separated from it by a public road, the 'White' farm, so called, had only been purchased by plaintiff in error ten days before the proceedings for condemnation were begun. The authorities cited by the defendant in error fully support their contention in this respect. In Currie v. Railroad, 23 Vroom 392, cited by counsel for plaintiff in error for the proposition that, where a part of a tract is taken for condemnation, damages to the remaining land shall be given, the court also says: 'It is an established rule in law, in proceedings for condemnation of land, that the just compensation which the land-owner is entitled to receive for his lands and damages thereto must be limited to the tract a portion of which is actually taken. The propriety of this rule is quite apparent. It is solely by virtue of his ownership of the tract invaded that the owner is entitled to incidental damages. His ownership of other lands is without legal significance.' It is enough to say that, in our opinion, the two other farms or tracts of land owned by plaintiff in error constituted such separate and independent parcels as regards the land in question that they cannot properly be spoken of as the residue of a tract of land from which the land in question was taken.'' In the foregoing case stress was laid upon the fact that Sharp had acquired and held the title to these separate and

contiguous farms under different holdings, that is, distinct deeds and chains of title.

What are the appreciable elements in a present tangible market value is often a delicate problem and one which to some extent enters into this case. For example, one Patterson owned the whole of one and parts of two other islands in the Mississippi river above the Falls of St. Anthony. His holdings formed substantially a line of shore for nearly a mile parallel with the west bank of the river and distant about one-eighth of a mile and amounted to about thirty-four acres. The location of these islands was such as especially fitted them to form an extensive boom for holding twenty or thirty million feet of logs (the logging business being extensively carried on in that country). This boom had never been built and the islands lay in nature's dress. A boom company was incorporated to build and operate booms and it undertook to condemn Patterson's entire holdings for its corporate purpose. The vital question was whether Patterson was entitled to pay for his holdings, considered in the light of their especial fitness and value for boom purposes, and the Supreme Court of the United States held that he was (Boom Co. v. Patterson, 98 U. S. 403), Justice FIELD speaking for the court, as follows:

"In determining the value of land appropriated for public purposes, the same considerations are to be regarded as in a sale of property between private parties. The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted; that is to say, what it is worth from its availability for valuable uses. Property is not to be deemed worthless because the owner allows it to go to waste, or to be regarded as valueless because he is unable to put it to any use. Others may be able to use it, and

make it subserve the necessities or conveniences of life. Its capability of being made thus available gives it a market value which can be readily estimated.

"So many and varied are the circumstances to be taken into account in determining the value of property condemned for public purposes, that it is perhaps impossible to formulate a rule to govern its appraisement in all cases. Exceptional circumstances will modify the most carefully guarded rule; but, as a general thing, we should say that the compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future."

This court has applied the doctrine of the Patterson case in Railroad v. Continental Brick Co., 198 Mo. 698, and the same principles have been applied in other cases; e. g., in Mississippi River Bridge Co. v. Ring, 58 Mo. 491; but a distinction has been drawn, and we think well drawn. If the use contended for be merely an intended use resting in the whims or hopes or plans of the owner, and is not a use springing from the special adaptation of the property and recognized as of present marketable value, then the mere fact that the property might be susceptible to such future use is too unsubstantial and problematical to be an element in estimating damages. [White v. Railroad, 154 Ill. 620; Peck v. Railroad, 36 Minn. 343; Gibson v. Bridge Co., 192 Pa. St. supra; Goodwine v. Evans, 134 Ind. 262; La. Ry. & Nav. Co. v. Xavier Realty, 115 La. Ann. 328.]

Now, take the case at bar and apply the foregoing views of the law to the facts, and it would seem, from any point of view, that the case was tried on a wrong theory. Defendant owned the Wallace tract, which he held under a chain of title describing it as "on the Mississippi river." He held the island under a chain of title describing it as "in the Mississippi

river." The two tracts were thereby recognized as not contiguous. If we turn to the evidence, we find the fact to be precisely as shadowed forth in defendant's muniments of title, to-wit, that a portion of the Mississippi river flows between the two tracts.

It would not be contended that defendant held title to a part of the channel of the Mississippi river, and his case, therefore, comes somewhat within the purview of those cases holding that an intervening strip of land, the title to which is not in the land-owner, destroys the right of such land-owner to have damages assessed to both tracts for a strip taken from one.

If the case be viewed from the standpoint of those cases holding that two tracts of land, separated by a street or road or canal but which are artificially connected with one another and have been improved together and been subjected to a single joint use, may be considered as one body of land for the purpose of assessing damages, yet, it does not fairly fall within that class of cases.

The case at bar seems more nearly belonging to that class of cases where there are two or more independent farms, held by separate chains of title, that have been subjected to an independent and distinctly separate use, and in which it is held that in condemning a strip off of one of these farms, the other farms though belonging to the same owner are not to be considered.

There are too many conjectures and problematical elements injected into defendant's feed-lot theory to make it the subject of consideration in estimating damages to any tract but the Wallace tract. Whether the Mississippi river will again assert its full domination over that part of its own channel between the island and the mainland cannot be known. Whether the stages of the water in the intervening channel will adjust themselves to cropping seasons so that crops from the island may pass over to the feed-lot on the shore,

with dependable certainty and regularity, can only be guessed at. Defendant may dream it will be so, he may hope it will come to pass, but neither his hopes nor his dreams may be assessed at a pecuniary value by a jury.

On this record we must, therefore, hold that the court erred in permitting the island tract to be considered by the jury, and erred anew in not giving plaintiff its instruction in that behalf.

IV. Other questions upon the instructions and upon the admissibility of evidence will naturally adjust themselves at a new trial and we deem it unnecessary to consider them in this case.

The cause is reversed and remanded to be re-tried in accordance with this opinion.

All concur.