---

Argued March 1, reversed March 21, 1916.

## SALISBURY *v.* GODDARD.

### (156 Pac. 261.)

**Fraud—Damages—Actions—Evidence.**

1. In an action for damages for misrepresentations in exchanging a rooming-house for land, evidence that one of the defendants after the sale suggested that the premises could be made to pay if run as an immoral resort is improper.

**Appeal and Error—Review—Harmless Error.**

2. In such case, where it does not affirmatively appear that the error did not affect the judgment, the judgment cannot, under Article VII, Section 3, Constitution, as amended (see Laws 1911, p. 7), be affirmed despite the error.

**Fraud—Misrepresentation—Actions—Damages.**

3. In an action for damages for misrepresentations in effecting an exchange of a rooming-house for plaintiff's lands, plaintiffs can-

not recover if they received in exchange for their lands property equal in value.

[As to right of action for misrepresentation, see note in **18 Am. St. Rep. 555.**]

**Trial—Reception of Testimony—Hearing of Witnesses.**

4. Under Section 856, L. O. L., declaring that the court may stop the production of further evidence upon any particular point when the evidence upon it is already so full as to preclude reasonable doubt, the court, while entitled in an action for damages which involved the values of property to limit the number of witnesses, should not, in view of the fact that the estimates of witnesses vary, limit defendants to three witnesses as to the value of property delivered to plaintiffs in exchange for land.

From Multnomah: CALVIN U. GANTENBEIN, Judge.

Department 1.    Statement by MR. CHIEF JUSTICE MOORE.

This is an appeal by the defendants John B. Goddard and A. W. Ehrlich from a judgment rendered against them for $2,650. The plaintiffs, Sarah L. Salisbury and E. P. Salisbury, her husband, in February, 1914, owned at Salem, Oregon, a city lot whereon was erected a dwelling, which real property was unencumbered. They had successfully operated at Olympia, Washington, a rooming-house, and, desiring to resume such business, Mrs. Salisbury called upon Goddard, a real estate broker at Portland, Oregon, and made inquiry for such a building in the latter city. He directed her to the "Hotel Bushmark," a lease of the two upper stories of which and the furniture, etc., in the rooms therein, had been listed with him by Ehrlich, the owner thereof, for sale or exchange. The landlord of such tenements was the Beaver Investment Company, a corporation, which had leased them for a term of five years from July 1, 1911, at $400 a month to Jacob Cassell, from whom Ehrlich, by mesne transfer and with the consent of the landlord, derived title. The furniture, etc., was hypothecated to that corporation to guarantee the payment of the rent as it ma-

tured, and also mortgaged to W. W. Green to secure the payment of $1,500, on account of which the tenant was required monthly to pay the interest and $50 on the principal. Mrs. Salisbury visited the Hotel Bushmark, and was so pleased with the location and prospects of success that her husband, pursuant to invitation, also called upon the broker, and made further inquiry about the building. After several inspections of the furniture, furnishings, etc., the plaintiffs, on February 11, 1914, subscribed their names to a writing, wherein they offered to execute to Ehrlich a warranty deed of their lot for an assignment of the lease and a transfer of the personal property. The value of the lot was estimated in the writing to be $3,000, while the worth of the tenancy and the property stipulated to be accepted was placed at $4,500, less, however, the mortgage of $1,500, thus making the several appraisements equal. Ehrlich accepted the plaintiffs' proposal by a writing wherein it was stated the exchange should be made within five days. The plaintiffs, having been notified of such acceptance, agreed with Goddard that an inventory of the furniture, etc., should be made on a stated day, but at the time so appointed they did not visit the Hotel Bushmark, having concluded the operation of the business would be too great an undertaking for their limited means. Goddard thereupon called upon them, and after some conversation and further assurances on his part they concluded to execute the deed, and pursuant to such solicitation, an exchange of transfers was made February 18, 1914. At that time it was learned that Ehrlich had paid on the chattel mortgage $150, which sum was liquidated by the plaintiffs. They took immediate possession of the hotel and operated it two months. A few days after quitting that business, the plaintiffs,

without tendering or offering to return any of the property which they had received, commenced this action.

It is alleged in the complaint that the lot in Salem at the time it was conveyed to Ehrlich was of the reasonable value of $2,500; that the defendants, conspiring to defraud the plaintiffs out of such real property, represented to them that for four months immediately prior to such conveyance Ehrlich, in operating the hotel, had made a monthly net profit of $150 to $200; that in order to effect a transfer of the possession of the hotel, the defendants represented to the plaintiffs that the rental thereof under the terms of the lease was $250 a month; that, relying upon such statements, an exchange of property was consummated; that by crafty devices the defendants prevented the plaintiffs from reading or seeing the lease, and in like manner did not allow them to examine the books of account, showing the extent and value of the business of the rooming-house, until after they took possession thereof; that such representations were false, in that the money received by Ehrlich from the hotel during the time so stated had been insufficient to meet the expenses of its operation; that the monthly rent reserved in the lease was $400, but the landlord was accepting $250 a month, thereby waiving at sufferance the right to demand the sum stated in the writing; that the value of the rooming-house and of the furniture, etc., therein was not equal to the mortgages thereon; and that by reason of such false representations the plaintiffs had been damaged by the loss of their lot $2,500 and $150 paid to Ehrlich, or in the sum of $2,650.

The separate answers of the defendants denied the material averments of the complaint, and for further defenses alleged, in substance, that prior to the assignment of the lease and the transfer of the furniture,

etc., the plaintiffs carefully inspected such property; that they were also fully advised in respect to the lease, and knew that though it provided for the payment of a monthly rental of $400, the landlord was receiving, and willing to accept during the then financial stringency, $250 a month; and that the Salem real property was, at the time the title was conveyed to Ehrlich, worth not more than $1,800, while the value of the lease and of the furniture was then $3,500. The reply put in issue the allegations of new matter in the answer, and the cause, being tried, eventuated as hereinbefore stated.                        REVERSED AND REMANDED.

For appellants there was a brief with an oral argument by *Mr. Julius N. Hart.*

For respondents there was a brief over the names of *Mr. W. H. Hallam* and *Mr. Charles E. McCulloch,* with an oral argument by *Mr. Hallam.*

Opinion by MR. CHIEF JUSTICE MOORE.

1. It is not alleged in the pleadings, nor does it appear from the testimony given at the trial, what disposition the plaintiffs made of the lease or of the furniture and furnishings of the hotel. As witnesses they severally testified in support of the averments of the complaint. On cross-examination Mr. Salisbury was asked if, prior to the commencement of the action, he had ever made any complaint to either of the defendants, in regard to the lease and the property which he had received. He answered:

"Well, after the bargain was concluded I had occasion to go to the Mr. Goddard's office, * * and when I went into the room Mr. Goddard says to me, 'What is the matter, Salisbury? What makes you look so disheartened? What is the trouble?' he says, 'You look

worried.' 'Well,' I says, 'that proposition up there don't look good to me.  I am afraid we are going to lose out.  I am afraid the old lady and I are going to lose out on it.  It don't look good.'  That is the complaint I made.

"Q. How long had you had the place then?

"A. Probably a week or ten days, or something along there."

On redirect examination, this witness was asked by his counsel:

"In this conversation that you were talking about a few minutes ago, did Mr. Goddard tell you how you could make any money on the place?"

To this question the defendants' counsel objected on the ground that the advice sought to be attributed to Goddard was given after an exchange of the property was consummated, and, this being so, any remarks then made by him were incompetent, irrelevant, and immaterial.  The objection was overruled and an exception allowed, whereupon the witness replied:

"When I started to go home Mr. Goddard took his overcoat and wanted to go along with me down the elevator, and he says, 'Mr. Salisbury,' he says, 'you want to get a lot of girls—some girls there.  That is the way to make it pay.'  I says, 'We don't do business that way.'  I says, 'If we can't make an honest living without that kind of work, we don't want to run a rooming-house.' "

The defendants' counsel thereupon moved to strike out such answer for the reasons stated in the objection interposed to the preceding inquiry, but the motion was denied and an exception allowed.

Mr. Goddard, as a witness in his own behalf, testified in support of the averments of the answers, contradicting many statements attributed to him by the plaintiffs.  On direct examination he was asked:

"Mr. Salisbury testified that you advised him to get some girls up there in the house. Mr. Goddard, what is the fact about that?"

The witness replied:

"No; I never done that. I have never done that in any instance."

2. It is believed that in denying the motion of defendants' counsel to strike out Mr. Salisbury's answer respecting the advice asserted to have been given to him by Mr. Goddard, as hereinbefore quoted, a very prejudicial error was committed. The question by which it was sought to elicit Mr. Goddard's advice might not have sufficiently called the attention of the court to the importance of the inquiry, so that from the form of the question it could be determined that the answer would necessarily be improper. When, however, Mr. Salisbury detailed the purported advice which he had received, the suggestion was thereby made known to the jury that by bringing prostitutes into the hotel for immoral purposes, more money might be obtained by such salacious pursuit than by keeping roomers who were noted for their probity. The minds of virtuous men who are called upon to try an issue of fact must necessarily be excited by, and their repugnance aroused toward, a party to an action who would advise another party thereto that the prosecution of a legitimate business might be enhanced and its financial success assured by a resort to the disreputable means asserted to have been suggested in this instance. The advice so imputed to Goddard, whether true or false, was made after an exchange of the property was consummated. It did not induce the plaintiffs to make the transfer, and hence the suggestion was immaterial. Aside from this, however, the remark was extremely prejudicial, in that it brought into the case an

irrelevant matter, well calculated to provoke the jurors and to induce an adverse finding by them. In refusing to strike out Mr. Salisbury's answer to the inquiry so objected to, an error was committed. From a careful consideration of the entire testimony, a transcript of which has been brought up, it cannot be affirmatively said that the judgment appealed from should be affirmed notwithstanding the error thus committed; and, such being the case, the rule prescribed by Section 3, Article VII, of the Constitution of Oregon, as amended, cannot be applied.

3. In view of the conclusion thus reached, it is deemed essential to consider another alleged error in order to prevent its recurrence at a retrial of this cause. It will be remembered that this was not a suit for rescission, but is an action at law to recover damages. If, therefore, the plaintiffs received property of equal value of the lot which they conveyed, and the money they paid, they were not injured and sustained no damages: *Van de Wiele* v. *Garbade,* 60 Or. 585 (120 Pac. 752); *Robertson* v. *Frey,* 72 Or. 599 (144 Pac. 128).

4. Though the cause was tried upon the theory of a recovery of damages, it is contended by defendants' counsel that an error was committed in limiting the number of witnesses whose testimony tended to substantiate or disprove such issue. The statute prescribing the mode of controlling interrogatories also provides:

"The court, however, may stop the production of further evidence, upon any particular point, when the evidence upon it is already so full as to preclude reasonable doubt": Section 856, L. O. L.

After hearing the testimony of three witnesses produced by the defendants as to the values of the respec-

tive properties which had been exchanged, the court inquired of their counsel how many more witnesses they desired to call upon that issue. Being informed that the testimony of five or six more would be offered, the court remarked that the sworn declaration of so many would not be heard. The defendants' counsel thereupon called another witness in order to make an offer of proof upon such issue, whereupon the court refused to hear any further testimony on that subject, and an exception to such ruling was reserved.

In *St. Louis, M. & S. E. R. Co.* v. *Aubuchon,* 199 Mo. 352 (97 S. W. 867, 116 Am. St. Rep. 499, 8 Ann. Cas. 822, 9 L. R. A. (N. S.) 426, 428), which was an action to determine the amount of damages which should be paid on the condemnation of land, the court limited the number of witnesses on that subject to four on a side, promulgating the rule, when the plaintiff's third witness on that question was under examination, and it was ruled that reversible error was thereby committed. The reason there given for the conclusion thus reached is so cogent that a lengthy extract from the opinion will be made. In deciding that case Mr. Justice LAMM remarks:

"On collateral and incidental issues, as, for example, the general reputation of a witness, or an issue upon a motion for a change of venue, or for costs, etc., it is a wise and a settled rule to allow trial courts wide discretion; and error predicated upon the exercise of such discretion should be palpable and manifest to be held prejudicial. Nor will we lay down any hard-and-fast rule circumscribing the power of trial courts, in the economy of time and dispatch of business, to put some reasonable bounds on the introduction of witnesses on a main issue in a civil suit, especially so where the evidence on a single point is not controverted, or where it is distinctly cumulative in quantity and quality. But evidently the matter should be approached with cau-

tion, and an arbitrary rule, allowing four witnesses to a side in a damage suit upon the issue of damage or no damage, cannot be defended. Much less can it be defended when the rule is made and applied (as here) after three witnesses have been placed upon the stand by one party. Picking and choosing become a vital matter under such rule, and even-handed justice requires that both parties have fair forewarning and the full privilege to pick and choose. This privilege was denied plaintiff, and thereby defendant had a distinct advantage, because, after the rule, plaintiff had but one choice, while defendant had four. But, on principle, the rule was arbitrary, and, we think, unreasonable. Defendant's damage might be composed of many elements, and one witness might be qualified on one element and another witness on another. Not only so, but there is a great difference between witnesses; and counsel, however wisely they may select, may ride to a fall on a given witness. His manner may be disappointing on the witness-stand, his capacity to tell what he knows may have been miscalculated, his voice may lack a note of sincerity; he may not stand the fire of a searching cross-examination; a yawn, a furtive glance of the eye, a shrug of the shoulders, impatient or impertinent remarks, a foolish reason given, or any one of many other supposable lapses or inadvertences, may destroy or weaken the value of human testimony, and neither court nor counsel have the prescience to say in advance that justice will be met by an arbitrary assignment of four witnesses to a side on a controverted question of damages in a cause that would sustain a verdict of $8,000.

"We are cited to no case by respondent that sustains such rule. In fact, the theory suggested by respondent upon which the assignment of error should be disallowed is that the motion for a new trial does not cover the point; but we do not read and construe the motion that way, and we think, on both reason and authority, error was committed in making and applying that rule in this case. In one reported case, involving damages under the exercise of the right of emi-

nent domain (*Chicago, M. & St. P. R. Co.* v. *Baker,* 102 Mo. 563 [15 S. W. 64]), '60-odd witnesses were introduced.' The phrase 'odd witnesses' in that instance (though not always) referring to number rather than to singularity. The jury are the sole and exclusive judges of the weight of the testimony. With that the trial court has nothing to do during the trial. If, then, the trial judge may, without any cause shown, project his will arbitrarily into the number of witnesses on the crucial point in the case, he may, by that token, entirely foreclose the weight of the evidence, and thus indirectly do what he may not directly do, to wit, interfere in a realm where the jury reign supreme; and, while we would not want to say that a trial judge must supinely and indefinitely sit with folded arms to hear a cloud of witnesses spin out evidence upon the same point, yet there was no such threatened abuse in this case, and the precedent established by the learned judge *nisi* ought not to be sustained. There may be conflict in the authorities, but the weight of judicial opinion and the quality of reasoning advanced therefor lie with the view herein expressed.''

See the numerous authorities there cited in support of the language thus employed.

Where the determination of an issue of fact by a jury involves the consideration of a question about which persons cannot materially differ, the court would undoubtedly be justified in limiting the witnesses to a reasonable number. If the production of further evidence cannot be limited, upon any particular point, unless the testimony received is already so full as to preclude reasonable doubt, as specified in Section 856, L. O. L., it might seem to follow that the power of a court to restrict the number of witnesses is practically denied, for the jury, and not the court, must determine the weight of the evidence, not from the number of witnesses produced on either side, but from the intrin-

sic value of their testimony.   A text-writer discussing
this subject observes:

"It has become almost a maxim that witnesses are
not counted, but that their testimony is weighed":
Jones, Ev. (2 ed.), § 900.

A determination of the measure of damages alleged
to have been sustained in any manner by a party neces-
sarily depends upon the opinion of witnesses as to
the extent of the injury.   These estimates are usually
quite inharmonious, and the number of witnesses neces-
sary to establish the truth of the issue ought to be such
as reasonably to enable the jury to obtain from their
testimony a word picture of the entire facts upon which
their verdict depends.   This aggregate representation
may be blurred by bias, stained by prejudice, or blotted
by interest, but such a delineation should be permitted
by the court as will enable the jury, by proper develop-
ment, to change the indistinct image into an actual por-
trayal of the real facts.   This cannot well be done in
the consideration of a question embracing the *quantum*
of damages, unless a sufficient number of witnesses are
allowed to testify on the subject.   What that number
should be in every instance cannot be determined in
advance, and must necessarily depend upon the degree
of intricacy involved in the issue and the extent of the
items constituting the subject matter.   The correct
number must depend, in a great measure, upon the trial
court's discretion, which will not be reviewed where
the fact sought to be established is not in dispute, or
is cumulative, or merely collateral to the main issue,
and only when it satisfactorily appears on appeal that
the number of witnesses has been unduly limited, or
the restriction imposed during the trial and without
adequate notice to the parties: Jones, Ev. (2 ed.), § 900.

If the number of witnesses had been prescribed be-
fore the trial began, so that the parties might have had

timely information thereof, or had there been a rea-
sonable rule of the court on the subject, less injury
might possibly have resulted, for in such case coun-
sel could have made a proper selection of their wit-
nesses, thereby presenting the strongest case possible.
In actions to recover damages, involving complicated
issues, no rule of court can be adopted that will remain
immutable, and yet fairly meet the requirements of all
cases, nor can the number of witnesses in such actions
be limited at the commencement of a trial and dispense
justice to each party who is entitled to a reasonable
time in which fairly to present his theory of the case.
Rules previously promulgated and orders made at the
beginning of a trial, to facilitate the dispatch of busi-
ness, unless such precepts are quite liberal, must occa-
sionally be departed from so as to subserve the rights
of the parties.   A sense of fairness will prompt a court
so to regulate the trial of a cause as to afford to each
party a reasonable time and proper opportunity to pre-
sent his side of the case for consideration.   No court,
however, is expected sluggishly to sit and patiently to
listen to all cumulative testimony that may be offered,
even in an action to recover damages, for to do so would
unduly delay trials and practically subvert justice.
The proper mean between the extremes in these sup-
posed cases should be ascertained by a court in the trial
of such actions.   The number of witnesses allowed
herein appears to have been unduly limited.

For the error committed in refusing to strike out
the testimony of Mr. Salisbury, as to the advice pur-
ported to have been given him by Mr. Goddard, the
judgment is reversed and the cause remanded for a
new trial.                    REVERSED AND REMANDED.

MR. JUSTICE BENSON, MR. JUSTICE BURNETT and MR.
JUSTICE MCBRIDE concur.