HENSON & SONS COAL COMPANY *v.* STRICKLAND.

Opinion delivered February 27, 1922.

1. WITNESSES—RULE LIMITING NUMBER.—When the testimony on a certain point in a cause becomes merely cumulative, and the court can see that further development on that line is unneces-

sary, it is within the discretion of the court to control the number of witnesses testifying to that particular issue; but it is error to limit the number of witnesses to the issues in the case generally.

2. APPEAL AND ERROR—HARMLESS ERROR.—While it was error to limit the number of witnesses to two on a side, appellant cannot complain if the rule was not enforced as to it.

3. APPEAL AND ERROR—AMENDMENT OF PLEADING TO CONFORM TO PROOF.—On appeal a complaint will be treated as amended to conform to the issues that were raised by the testimony introduced by the parties without objection.

4. APPEAL AND ERROR—CONCLUSIVENESS OF CHANCELLOR'S FINDING.—Evidence *held* to sustain the findings of the chancellor.

Appeal from Sebastian Chancery Court; *J. V. Bourland,* Chancellor; affirmed.

*Holland & Holland,* for appellant.

1. It was an abuse of discretion, and highly prejudicial, to limit the number of witnesses to two on each side. 116 Am. State Rep. 516; 42 Ill. App. 553; 83 *Id.* 329; 98 *Id.* 444; 26 R. C. L. 1033-4, § 37; 97 S. W. (Mo.) 867.

2. The decree was erroneous in that it granted relief not prayed for in the complaint. Even under a prayer for general relief, the court cannot go outside the case made by the pleadings. 1 Black on Judgments, 2nd Ed. § 141.

3. The contract involved here is to be interpreted in the light of the intent of the parties at the time it was made. 149 S. W. 75; 94 Ark. 461; 90 Ark. 272; 46 *Id.* 130.

*W. L. Curtis,* for appellees.

1. Before appellant can complain of the action of the court in limiting the number of witnesses as prejudicial, it must be made to appear that it was thereby prevented from introducing testimony which it could have produced, that would have had a tendency to change or alter the established facts in the case. C. & M. Digest, § 2167; 44 Ark. 180; *Id.* 556; 45 *Id.* 177; 48 *Id.* 312; 43 *Id.* 296; 46 *Id.* 542; 57 *Id.* 242.

2. In the light of the facts and circumstances disclosed in the record, the complaint and the prayer for relief should be treated as amended so as to conform to the decree. 24 Ark. 326; 100 *Id.* 212; 97 *Id.* 576; 94 *Id.* 365; 82 *Id.* 603.

3. To effectuate the intention of the parties to a contract is the cardinal rule for interpretation thereof. 94 Ark. 461; 15 *Id.* 286; 3 *Id.* 222; 28 *Id.* 282; 23 *Id.* 63. The parties are bound only as far as they intend to be bound. 34 Ark. 303.

WOOD, J. The Western Coal & Mining Company was the owner of coal underlying the NW¼ of the SW¼ and the NE¼ of the SW¼ of section 31, township 7 N, range 31 west, in Sebastian County, Arkansas. On the 22nd of June, 1915, the Western Coal & Mining Company executed a coal mining lease upon the above lands to the Mama Coal Company, a corporation. On the 20th of February, 1919, the latter company sub-leased a part of its coal and mining lease to J. L. Henson, J. W. Strickland and Edgar McDonald. McDonald soon thereafter sold his interest to his partners, J. L. Henson and J. W. Strickland. Henson and Strickland opened up what is designated in the record as "Mine No. 17½" near the southwest corner of the east forty acres of the above described tract. The main slope or entry of Mine No. 17½ was driven a little east of north. On the 20th of January, 1920, Strickland and Henson entered into an agreement by which they dissolved partnership. By the terms of the agreement Henson was to assume all liabilities of Mine No. 17½, and Stickland was to open up a new mine west of Mine 17½ to be known as "Mine No. 5."

Soon after the dissolution of the partnership between J. L. Henson and J. W. Strickland, the Henson & Sons Coal Company, a corporation, of which J. L. Henson is the president, took over Mine No. 17½. J. L. Henson was also the president of the Mama Coal Company. On the 24th of January, 1920, the Mama Coal Com-

pany executed a coal mining lease of the above lands to J. W. Strickland and Valentine Vervack. This lease covered the period of the lease agreement between the Western Coal & Mining Company and the Mama Coal Company, and the lease between those companies was referred to and made the basis of the lease agreement between Mama Coal Company and Strickland and Vervack, except as otherwise provided. By the terms of the lease between the Mama Coal Company and Strickland and Vervack "the lessees agree to open a mine about half way between Mine No. 17½ and the old Man-way Mine No. 17, said mine to be known as Mine No. 5, and agree to mine and remove all coal in such a way as will not interfere with the workings of either Mine No. 17½ or Mine No. 3." Mine No. 3 referred to in the above lease between the Mama Coal Company and Strickland and Vervack is situated on the original lease, *supra,* made by the Western Coal & Mining Company to the Mama Coal Company. The main entry or slope of this Mine No. 3 was near the southwest corner of the west forty acres above described in the lease from the Western Coal & Mining Company to the Mama Coal Company.

After the lease of the Mama Coal Company to Strickland and Vervack was executed, the lessees entered upon the lands to the west of Mine No. 17½ near the southern boundary of the west forty acres; and at a point satisfactory to all parties, opened up and drove their main entry or slope in a northwesterly direction so as to reach a body of coal which was not accessible to either Mine No. 17½ or Mine No. 3, on account of a fault in the formation. About the first of May, 1920, Henson & Sons Coal Company, in the course of development of Mine 17½, turned off from the main slope or entry of this mine and opened up from such main slope or entry what is designated in the record as "the second west entry." This entry ran in a westerly direction from the main entry of Mine No. 17½. Henson & Sons Coal Company continued to work in this "second west entry" until the second of December, 1920, when a temporary injunc-

tion at the instance of Strickland and Vervack was issued restraining J. L. Henson and Henson & Sons Coal Company from further operating on this "second west entry." After the temporary injunction was issued and before the day for final hearing, Henson & Sons Coal Company filed its complaint against Strickland and Vervack and against Pink Shaw, who, at the instance of Strickland and Vervack, had been appointed receiver to take charge of the property of Henson & Sons Coal Company. In its complaint Henson & Sons Coal Company, among other things, set up that Strickland and Vervack, in working their mine No. 5, were driving an opening and operating their mine in such a way as to interfere with the workings of Mine No. 17½ and Mine No. 3, and in violation of the terms of their lease and of the lease of Henson & Sons Coal Company. Henson & Sons Coal Company prayed that the temporary injunction issued at the instance of Strickland and Vervack be dissolved, and that upon a final hearing they be restrained from interfering with Henson & Sons Coal Company in the operation of the west entry.

Strickland and Vervack answered the complaint, denying its allegations. They set up the various leases and reiterated the allegations of their complaint for a temporary injunction, and alleged that J. L. Henson and Henson & Sons Coal Company were seeking to operate Mine No. 17½ without any authority from either the Western Coal & Mining Company or the Mama Coal Company. Among other things, they alleged that Henson, the president of Henson & Sons Coal Company, was also president of the Mama Coal Company, and that he was in possession of all the facts contained in the various leases, reciting them, and by reason of such knowledge that he was estopped, either in his individual capacity, or on behalf of Henson & Sons Coal Company, from denying to Strickland and Vervack the right claimed by them under their lease to work Mine No. 5, as they were then working and proposed to work the same. . . .

The causes were consolidated at the hearing. The court, upon the issues above presented, made findings substantially as above set forth, and in addition to the facts as already set forth, made substantially these further findings:

That the Western Coal & Mining Company, several years prior to the filing of this suit, had operated what is designated in the record as Mine No. 17 upon the lands above described, and had worked out and taken the principal part of the coal underlying these lands, with the exception of stumps or pillars, which had been left in the old Mine 17 for the purpose of supporting the roof or surface above, and had left some additional tracts which were inaccessible to the workings of Mine 17 because of certain faults in formation; that from the main slope of Mine 17 it had various entries running in easterly and westerly directions across the tract; that when Strickland and Henson entered into their agreement dissolving the partnership between them, Strickland did not by that agreement in any way release the rights conveyed to him to mine coal underlying the lands in controversy; that it was the intention of the parties by that dissolution agreement only that Strickland should relinquish to Henson his interest in the development and equipment of Mine No. 17½ and not his right to mine coal from the main entry that he had driven and from which he was operating in Mine No. 5.

The court found that Strickland and Vervack had expended in excess of $8,000 in opening up Mine No. 5 in the manner in which they were doing, and that, after they had made this investment in the development of that mine, Henson & Sons Coal Company turned a west entry off of Mine No. 17½ and drove the same into the workings of old Mine 17 and into an east and west entry thereof and proposed to lay its mine track along same to a point directly in front of and to the west of the main entry of Mine No. 5, which Strickland and Vervack were driving across their mine lease a little bit west of north; that Henson had begun to shoot down and

remove stumps and pillars and remaining coal from the workings of old Mine 17 in such a way as to remove the supports of the roof and earth above said workings, which would cause the same to cave in, with the result that Strickland and Vervack would be cut off from access to any minable coal to the north and in front of the direct line of their main entry or slope.

The court further found that Mine No. 17½ was being operated by Henson & Sons Coal Company only under such authority as it had under the joint lease from the Mama Coal Company to Henson, Strickland and Mc-Donald. The court found that there was no express agreement between Henson and Strickland as to the boundaries within which Mine No. 17½ and Mine No. 5 should be operated, but that, from all the testimony in the case, it was the understanding and intention of the parties that Mine No. 17½ should have the privilege and right to take all of the coal underlying the east forty acres of said land to the east of its main north and south slope or entry, and that Mine No. 5 should take all of the coal from a point one hundred feet east of its north and south entry extended to the north boundary underlying the west forty acres of said tract, with the exception of that portion of same which is occupied by the workings of Mine No. 3 to the west.

The court entered a decree in accordance with its findings, forever restraining J. L. Henson and Henson & Sons Coal Company from proceeding to enter upon and mine and remove the coal from the above described tract of land from a point west of 100 feet east of the main slope or entry extended to the northern boundary of said tract of Mine No. 5. From that decree is this appeal.

1. The appellant contends that the court erred in arbitrarily limiting the number of witnesses in the case to two to the respective sides. The bill of exceptions brought into the record shows the following: "The court announced at the beginning of the trial, and after all the witnesses had been sworn, that it would hear only

two witnesses each for the respective sides, to which the defendants at the time excepted." The rule of the court limiting the litigants to two witnesses to prove their respective contentions was unreasonable and arbitrary. *St. Louis, etc. Ry. Co.* v. *Aubuchon,* 97 S. W. (Mo.) 867. Such rule applied to the main issue or issues in lawsuits might result in great injustice and in many instances render it impossible for the person upon whom the burden of proof rests to recover. For, under such a rule, it might often occur that the witnesses for the respective sides would be equally credible; that the character and nature of their testimony might be such as to cause them to be considered as equally credible, and that their testimony therefore should be given the same weight.

Thus, under such circumstances, the party having the burden of proof must necessarily fail. Whereas, if his witnesses were not limited, it might be within his power, by the number or character of other witnesses, to meet the burden of proof and recover on his cause of action. While preponderance is not determined alone by the number of witnesses, yet numbers are not to be ignored, and the circumstances might be such that the number of witnesses would be an important factor in arriving at a conclusion as to the preponderance of the evidence. Restricting the witnesses to any given number on the respective sides in many instances might lead to a deadlock on the question of preponderance of evidence and cause the party having the burden to lose his case, when otherwise he might meet the requirements of the burden of proof simply by having a greater number of equally credible witnesses to the facts that control the issues involved.

In *Jones* v. *Glidewell,* 53 Ark. 161-178, Chief Justice COCKRILL, speaking for the court, said: "Limiting the time for the examination of witnesses, the number of witnesses to a given point, stopping repetitions and irrelevant examinations, are matters necessarily confided to a trial judge." When the testimony becomes merely cumulative on a certain point in the cause, and the court

can see that further development on that particular line is unnecessary, of course it is within the discretion of the court to control the number of witnesses testifying to that particular issue. Here the court did not undertake to limit the number of witnesses testifying to a given issue that had already been fully developed, and where further testimony would be only cumulative, but, under the rule announced witnesses were limited to a given number, not on any given point, but to the issues in the case generally. We cannot give our sanction to such a rule.

Judge Freeman, in his notes to *St. Louis, etc. Ry. Co. v. Aubuchon,* reported in 116 Am. State Rep., page 516, says: "It is a well settled principle of constitutional law that no person shall be condemned without a hearing, and that every one who is by process called into court in any matter affecting his interests has an absolute right to be heard, and that any judgment pronounced when such hearing is refused is void. Can there be any difference in principle between refusing a hearing and according a partial hearing only? It would seem that the power to limit the number of witnesses which will be heard on a contested issue can be upheld only when it is apparent that a party is trifling with the court and seeking in bad faith to waste its time and obstruct the administration of justice, and that a verdict or finding against him on such issue must be set aside when he was denied the right to offer and have received all the evidence and witnesses produced by him, for under no circumstances can it be judicially known that such additional evidence or witnessess, if received, would not have overcome those of his adversary. To restrict the parties, as courts sometimes do, to an equal number of witnesses on each side of the question, must, under ordinary circumstances, result in a verdict against the person on whom the burden of proof rests, for he cannot be held to have sustained such burden where the testimony offered by him only equals that offered by his adversary." See also 26 R. C. L. 1034, sec. 37; *Cook Brewing Co.* v. *Ry.* 98 Ill. App. 448; *Crane Co.* v. *Stamus,*

83 Ill. App. 329; *Traders Ins. Co.* v. *Catlin*, 71 Ill. App. 569; *South Danville* v. *Jacobs*, 42 Ill. App. 533.

We approve the rule thus expressed by Judge Freeman, and hold that a trial court taking testimony *ore tenus* should not undertake to limit the number of witnesses introduced by the respective parties until it becomes obvious to the court that the parties by the sheer number of witnesses introduced to some particular fact or issue are merely producing cumulative testimony, thus unnecessarily consuming the time of the court, and hampering the administration of justice. But, while condemning the rule above announced by the trial court, it appears that the court in this case departed from its own rule, for it permitted the appellant to introduce three witnesses. Thus the rule was not enforced to the prejudice of the appellants. Furthermore, the appellant did not offer to introduce any more witnesses whose testimony they desired in addition to the testimony of the witnesses already adduced. Therefore, the appellants were not prejudiced in the rule announced by the trial court.

2. The appellant contends that the court erred in granting relief "not asked for in the complaint or petition for injunction." The appellees prayed for an order of the court perpetually "restraining and enjoining the defendant, J. L. Henson, his agents, servants and employees from going into the workings of old Mine No. 17 or any part thereof, and from taking therefrom any of the pillars or supports located therein, or from in any other way obstructing the passage ways of said mine line, or in any other way preventing or obstructing these plaintiffs from using same as a passage way to reach the body of coal located adjacent to and on the north of said workings * * * * and all other proper relief."

The complaint on appeal should be treated as amended to conform to the issues that were raised by the testimony introduced by the parties without objection. *Citizens' Fire Ins. Co.* v. *Lord,* 100 Ark. 212; *Pu-*

*laski Gas Light Co.* v. *McClintock,* 97 Ark. 576; *Rucker* v. *Martin,* 94 Ark. 365.

The prayer of appellees in their petition or complaint was certainly sufficiently comprehensive to justify the court in granting to the appellees all the relief set forth in the decree. Was the testimony adduced sufficient to sustain the findings upon which the court rendered its decree? This is purely a question of fact, and one we have found difficult to decide. It could serve no useful purpose as a precedent to set forth and discuss in detail the testimony, which is rather voluminous. After a careful consideration of the provisions of the various leases and the testimony of the witnesses concerning the workings of the coal mines thereunder, we are convinced that the findings of the trial court are sustained by a preponderance of the evidence. We therefore adopt such findings as our own.

We are largely controlled in this conclusion by the construction which the Mama Coal Company, the immediate lessor of the parties, placed upon the leases under which the parties to this record were operating the mines under their respective leases. The record shows that the Mama Coal Company, when its attention was called to the local situation in the operation of the mines by the respective parties, through its board of directors issued a notice in writing to the appellant, which, among other things, specified as follows: "It has come to the attention of the Mama Coal Company that you, in working the Mine No. 17½ under your lease from said Mama Coal Company, have removed and are about to remove some of the remaining pillars in Mine No. 17 and in front of slope of Mine No. 5, all of which is contrary to any rights vested in you by your lease on Mine No. 17½, and all of which is not in keeping with good mining, and is contrary to any rights vested in you under your said lease. And you are hereby further notified not to in any way disturb any of the pillars or workings of said Mine No. 17, or to shut off or obstruct the extension of the slope of Mine No. 5, and that any act

upon your part in violation of this notice shall and will operate as a cancellation of your said lease on Mine No. 17½.''

This construction of the lease by the Mama Coal Company, taken in connection with the other testimony adduced on behalf of the appellees, shows that the appellants, by undertaking to shut off and obstruct the appellees in the extension of their main slope in Mine No. 5, were violating the rights of the appellees under the contract by which the partnership between Henson and Strickland was dissolved, and under the terms of which the appellees opened up Mine No. 5 between Mine No. 17½ and Mine No. 3. The lease executed by the Mama Coal Company to the appellees, (which was for the purpose of enabling the appellees to open up Mine No. 5 in pursuance of the contract of dissolution of the partnership between Henson and Strickland) provided that the lessees (appellees here) ''should open up Mine No. 5 half way between Mine No. 17½ and the old Man-way to Mine No. 17, and agree to mine coal in such a way as not to interfere with the workings of either Mine No. 17½ or Mine No. 3.'' The preponderance of the evidence shows that the workings of Mine No. 5 by the appellees did not interfere with the workings of Mine No. 17½ or Mine No. 3, but the appellants, in driving their ''second west entry'' into the workings of old Mine No. 17 and in following said entry to the west as they were doing, would shut off and prevent the appellees from extending the main slope of their Mine No. 5 on the lands covered by their lease.

The trial court, after hearing all of the evidence, interpreted the contracts as the Mama Coal Company interpreted them as shown by the above notice. Without entering into further detail, it suffices to say that the findings of the trial court are in all things correct, and its decree is therefore affirmed.