THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. DOMINICK MUCCI, DEFENDANT-APPELLANT, AND
JOHN DOE, ALSO KNOWN AS "ARTIE," DEFENDANT.

Argued October 7, 1957—Decided December 9, 1957.

424

*Mr. Martin Klughaupt* argued the cause for appellant.

*Mr. William J. Arnold,* Assistant Prosecutor, argued the cause for the State. *Mr. William C. Brudnick,* Special Assistant Prosecutor, on the brief (*Mr. Guy W. Calissi,* County Prosecutor, attorney).

The opinion of the court was delivered by

HEHER, J. The defendant was convicted by a jury in the Bergen County Court under an indictment returned June 14, 1956, charging that he "and John Doe, also known as 'Artie,' whose name to this Grand Jury is unknown," "on or about May 27, 1954 and from thence continuously until" July 30, 1955, in the Borough of Lodi, "did commit the crime of conspiracy in that then and there they unlawfully conspired together to conduct the practice of bookmaking on the results of sporting contests, to wit, Baseball Games," followed by a specification of overt acts allegedly done to effect the object of the pleaded conspiracy; he was sentenced to confinement in the State Prison for a minimum term of not less than two years and a maximum term of not more than three years, and to pay a fine of $1,000;

and the appeal brings up for review the judgment of conviction, on our certification, *sua sponte*, to the Appellate Division of the Superior Court.

A prior indictment found September 1, 1955, laid to Mucci the practice of bookmaking on the results of baseball games in violation of *N. J. S.* 2A:112–3; and thereafter, February 14, 1956, the State, pursuant to an order made on the accused's motion, furnished a bill of particulars averring the "practice of bookmaking * * * by making and taking and recording and registering bets and wagers" on the "results of baseball games" and "the paying of moneys won thereon and collecting the moneys lost on such wagers and bets" during the "Major League Baseball Season in the years 1954 and 1955," both in Lodi and Hackensack, "continuously during said period," "on Mondays and Tuesdays of each week" in Hackensack, "outside the premises 37 Main Street, on Morris Street near the corner of Main Street" and at 51 Main Street, and also at 175 Essex Street in 1955, and "on the balance of the days of the week" during the given period in Lodi "at 9 Linden Street."

March 5, 1956 the accused, in accordance with the State's "demand for particulars," as is said, supplied the names and addresses of witnesses upon whom he would rely, some 126 in number, "to establish his presence at various places other than the places charged by the State as having been the scene of the alleged acts committed by the defendant"; thereupon the accused demanded of the State the names and addresses of all witnesses intended to be called to establish his "presence" at the places and premises designated in the State's bill of particulars as the "scene of the alleged offense"; and the State responded by identifying four such witnesses, by name and place of residence.

July 29, 1956, following the return of the indictment for conspiracy, and with relation to that indictment, the accused submitted to the State the identical list of "alibi" witnesses given on the return of the earlier indictment and made demand for the names and addresses of the witnesses the State intended to call to prove his "presence" at the "scene"

of the offenses alleged in this indictment; and the State replied as it had to the same inquiry upon the earlier indictment.

The accused then moved for a bill of particulars directed to the content of the conspiracy indictment; the motion was denied, and leave to appeal was refused.

March 27, 1957 both indictments were moved for trial; and, on objection by the accused that the notice of trial had reference only to the conspiracy indictment, a clerical inadvertency, the State proceeded on that indictment alone.

The State adduced evidence tending to show that the accused had arranged with the several witnesses, three in number, for their placing of bets and wagers on baseball games by calling a given telephone number, Gregory 1-3646, and that accountings were had for the winnings and losses and payment made accordingly. Said one witness: "We would straighten out on Mondays, once a week"; the individual wagers by telephone varied from $5 to $100; the accused "would come around on Mondays," and "we would settle up; either I would pay him or he would pay me"; the witness would call the designated telephone number and "ask for the line, that means the odds"; that was the course throughout the baseball season. And it was the pattern followed by the other witnesses. One said that at the outset he did not know with whom he was dealing by telephone, but later on he "found that his name was Artie." The accused gave another witness "a credit of $100" for wagering by telephone. They all had weekly accountings with the accused, "usually Mondays, occasionally Tuesday"; the largest sum won by one witness was $363. His telephone communicant, the particular witness said, was not defendant: defendant "has a foreign accent," and the "man on the telephone did not."

The accused did not become a witness; and hence all this testimony went undenied. He called nine witnesses: one, an employee of the telephone company, testified that the telephone number Gregory 1-3646 "was listed for and billed to Miss Teresa Belli" at 9 Linden Street, Lodi, and

there was another telephone "registered" for 9 Linden Street, Lodi, in the name of Arthur Belli; Arthur Belli, a brother of Teresa, was, it seems, a witness before the grand jury in the inquiry that eventuated in these indictments; there were "character" witnesses, and four were residents of a "trailer park" at 99 Dell Glen Avenue, in Lodi, said to have been "actively operated" by the accused throughout the period covered by the indictment, summoned "as people who had lived there during the same period," according to counsel, "to give testimony as to [the accused's] actual presence there, and, by their combined testimony, to establish the period of time, within the period covered by the indictment, that he was there, attending to his business and not in Hackensack as charged."

After testimony had been taken in this regard from the latter witnesses and another, who was not a resident of the trailer court and who vouched also for defendant's reputation, the county judge said that the time had arrived "to limit cumulative testimony" and, since five such witnesses had testified, but two more would be allowed "as to character and his whereabouts during the period in respect to the trailer camp," yet there would be no limitation "as to any other witnesses as to his other whereabouts"; the limitation would apply only "as to his being at that office at certain times in the trailer camp."

And this ruling is now assigned for error, as constituting a denial of the accused's "right to present the testimony of his remaining witnesses as to alibi." It is said that he was thus deprived of "twelve witnesses from whose combined testimony the jury could have found that the defendant was actually in Lodi at his trailer camp during the time when the State claims he had continuously committed acts of bookmaking in Hackensack."

## I.

It is said in argument, citing *State v. Randle*, 128 *N. J. L.* 496 (*Sup. Ct.* 1942), as consistent with the offered thesis,

that while the court may, in the exercise of a sound discretion, "and with proper regard to the type, nature and circumstances of a case, reasonably limit the number of witnesses * * * as to collateral matters, such as reputation, impeachment of witnesses and expert opinion," it "has no right to limit the number of witnesses * * * as to a controlling fact, or facts and circumstances bearing thereon," citing *People v. Arnold,* 248 *Ill.* 169, 93 *N. E.* 786 (*Sup. Ct.* 1911); *Reynolds v. Port Jervis Boot & Shoe Factory,* 32 *Hun* 64 (*N. Y. Sup. Ct.* 1884); *Henson & Sons Coal Co. v. Strickland,* 152 *Ark.* 203, 238 *S. W.* 5 (*Sup. Ct.* 1922), holding that the limitation of the number of witnesses "on a contested issue" is sustainable "only when it is apparent that a party is trifling with the court and seeking in bad faith to waste its time and obstruct the administration of justice, for under no circumstances can it be judicially known that such additional evidence or witnesses, if received, would not have overcome his adversary."

And reference is made to a case, *St. Louis, Memphis & S. E. R. Co. v. Aubuchon,* 199 *Mo.* 352, 97 *S. W.* 867, 9 *L. R. A., N. S.,* 426 (*Sup. Ct.* 1906), affirming that the limitation cannot be applied where the subject of the inquiry is "composed of many elements, and one witness might be qualified on one element and another witness on another," or where persuasion could turn upon the particular knowledge and testimonial qualifications of a given witness or upon cumulation. But the court there spoke of the "crucial point in the case," and the danger "of foreclos(ing) the weight of the evidence," and declared that "while we would not want to say that a trial judge must supinely and indefinitely sit with folded arms to hear a cloud of witnesses spin out evidence upon the same point," there was "no such threatened abuse in this case, * * *."

By way of application of the principle to the case at hand, it is urged, citing *Reynolds v. Port Jervis Boot & Shoe Factory, supra,* that we are not now concerned with "questions collateral to the facts in issue" but rather the right of a party "to call all his witnesses" ·in regard to the "chief

issues litigated"; and that "the excluded witnesses" here
"were each to contribute testimony tending to establish the
defendant's alibi," and the "sum total of all such testimony
would have furnished the jury with evidence" to sustain
"the inference that the defendant was not at the scene of the
alleged acts, or it might have raised reasonable doubt of
the defendant's guilt," obviously not a "collateral matter."
In a word, the insistence is that "[n]ecessarily, the testimony
of each witness could relate only to those periods within the
period of the indictment that each had been at the trailer
park *and* in a position to make an observation"; the "oppor-
tunities of each witness to make such an observation neces-
sarily vary chronologically with each witness because of such
variable factors as hours of employment, periods of time
spent indoors absorbed in the care of children and house-
work, periods spent away from the premises, for instance, for
shopping," and "[it] would be absurd to assume that the
chronological opportunities of each witness to make observa-
tions coincided with the opportunities of every other witness."

But in all seeming, the proffered evidence could show only
that during the period of the alleged commission of the
several pleaded overt acts in the pursuit of the alleged
conspiratorial endeavor, the accused was engaged in a legiti-
mate business enterprise, a mode of proof somewhat akin to
evidence of "character," by way of disposition or reputation
in the community, *State v. Lee*, 22 *Minn.* 407 (*Sup. Ct.*
1876); and, whatever its probative worth for other purposes,
it had little or no virtue as proof of the essential and rele-
vant fact of alibi. Counsel made it quite clear in his colloquy
with the court that the tendered testimony was in testimonial
quality no different than that adduced from the witnesses
called and was infected with the same vice; and so the
accused did not suffer prejudice in the ruling under review.

The theory seems to be that because the accused was at
the time engaged elsewhere in a lawful undertaking he
could not have participated in the conspiracy to violate the
gaming laws nor commit the overt acts laid to him in the
indictment, an obvious *non sequitur*.

 The process of all evidence is an inference from one fact to the existence of another. Evidence is always a relative term; it signifies a relation between two facts, the *"factum probandum,"* or proposition to be established, and the *"factum probans,"* or material evidencing the proposition; all evidence must involve an inference from some fact to the proposition to be proved. *Wigmore on Evidence (3d ed), sections* 2, 12, 25, 26, 475.

 And the literal meaning of the term "alibi" is "elsewhere; in another place." *Webster's International Dictionary 2d ed.* The plea of "alibi" is not an affirmative defense in the strict, technical sense, but it is defensive in nature. The State has the burden of proving that the accused committed the criminal act; and the accused may offer evidence tending to show that at the alleged time of the commission of the act charged, he was elsewhere than at the alleged place of its commission, and thus to overcome the case made by the State. The defense of alibi has its evidential efficacy in the physical impossibility of the accused's guilt; and where the offered evidence does not meet this standard, the defense of alibi is not sustained. *Singh v. State,* 35 *Ariz.* 432, 280 *P.* 672, 67 *A. L. R.* 129 (*Sup. Ct.* 1929); *Blackwell v. State,* 79 *Fla.* 709, 86 *So.* 224, 15 *A. L. R.* 465 (*Sup. Ct.* 1920); *State v. Wagner,* 207 *Iowa* 224, 222 *N. W.* 407, 61 *A. L. R.* 882 (*Sup. Ct.* 1928); *Yarber v. City and County of Denver,* 116 *Colo.* 540, 182 *P. 2d* 897 (*Sup. Ct.* 1947); *State v. Brady,* 244 *Minn.* 455, 70 *N. W. 2d* 449 (*Sup. Ct.* 1955); *Tomlinson v. United States,* 68 *App. D. Ct.* 106, 93 *F. 2d* 652, 114 *A. L. R.* 1315 (*App. D. Ct.* 1937), *certiorari* denied 303 *U. S.* 646, 58 *S. Ct.* 645, 82 *L. Ed.* 1107 (1938).

*R. R.* 3:5–9, derived from *R. S.* 2:190–7, requires the accused, on demand by the State, to furnish a bill of particulars "stating the specific place or places at which the defendant claims to have been at the time of the alleged offense," and the names and addresses of the witnesses upon whom he intends to rely to "establish such alibi"; and the State, in turn, upon demand made, is obliged to give the

names and addresses of the witnesses to be relied upon to establish the accused's "presence at the scene of the alleged offense." Here, the conspiracy laid to the accused was a continuing offense. Compare *State v. Pennsylvania R. Co.,* 84 *N. J. L.* 550 (*Sup. Ct.* 1913). But we need not pursue the inquiry.

The testimony as to the accused's "presence" at the trailer court was of little or no value in proof of the claimed alibi; he was there "regularly," "every day"; "most every day"; "every afternoon"; "Sunday afternoon, all the afternoon"; "every night"; "all day Sundays"; "rainy days"; "not there in the morning"; "not [there] all the time"; "frequently at noon"; he "came in the early evening, supper-time"; "once or twice a week"; "Saturdays and Sundays." None could say that the accused was there on a given day. Indeed, counsel said, in objecting to such interrogation: "This witness was not offered on the basis that [the accused] was ·definitely there every day or a particular part of a day. How he can expect her to remember and pinpoint a particular date is beyond me," reason enough to reject the testimony as of no probative consequence. And from the remaining witnesses would have come more of the same. The accused was not alone in the operation of the trailer court; he had an associate in the ownership and management, and there also was an office assistant in daily attendance; he was never there during the morning, an acknowledged fact.

And counsel, at one point, said that these witnesses were "being used" as "character" witnesses "in addition to stating the man's business and what his occupation was during this period of time."

The action of· the county judge was plainly within the bounds of reasonable discretion. Counsel was advised that he was not limited "as to any other witnesses as to his other whereabouts"; the limitation concerned only like testimony as to the accused's presence at the trailer court. The accused sustained no injury by the course thus taken.

"Cumulative" evidence is defined as "additional evidence to support the same point, and of the same character as the evidence already produced." *State v. Murphy,* 87 *N. J. L.* 515 (*E. & A.* 1915). A party does not have "an absolute right to force upon an unwilling tribunal an unending and superfluous mass of testimony limited only by his own judgment or whim"; for witnesses "upon *any point whatever* a similar rule of limitation may be enforced"; it "may not be possible to define any other specific classes of witnesses or of facts for which a rule can be laid down; but it is possible to sanction a general rule as applicable in the circumstances of the case, to any kind of fact or witness whatsoever"; and while a court sometimes declares "the qualification that the limiting of numbers is proper only upon *collateral issues,*" the "term 'collateral' is a much-abused one; it is difficult of definition and should be avoided"; "moreover, there is no reason here for such a restriction of the rule; the exigency may equally arise upon any part of the issue as the reasons above given indicate clearly." *Wigmore on Evidence* (3d ed.), *sections* 1907, 1908. See *Michelson v. United States,* 335 *U. S.* 469, 69 *S. Ct.* 213, 93 *L. Ed.* 168 (1948).

Care must be exercised to avoid an undue intrusion upon the substantial right of the accused in a criminal case to a fair trial, for the cumulation of testimony in relation to the substantive issues may bear upon the ultimate quality and weight of the evidence; the question calls for the exercise of a sound discretion in the context of the circumstances of the particular case. There can be no doubt as to the power, as thus confined; the "right, within reasonable limits, to restrict the number of witnesses to be examined as to any one point or fact" is essential to the due course of justice. *State v. Lee,* 203 *S. C.* 536, 28 *S. E.* 2d 402, 149 *A. L. R.* 1300 (*Sup. Ct.* 1943).

The rule was applied to alibi witnesses on the trial of an indictment for robbery. The holding was that on the assumption that the witnesses had "testified as fully as it was proposed the non-testifying witnesses would testify," it

could not be said as a matter of law that there was error in the limitation; that limiting the "number of witnesses on a particular point" is permissible unless in the special circumstances it constitutes an abuse of discretion. *State v. Lamb,* 141 *Mo.* 298, 42 *S. W.* 827 (*Sup. Ct.* 1897). See Annotations, 21 *A. L. R.* 335; 48 *A. L. R.* 948.

## II.

■ Cross examination of the State's witnesses offered in proof of the pleaded conspiracy revealed that on the morning of the trial, while together in the county prosecutor's office in the Court House, they were provided by a county detective with a transcript of their testimony given to the grand jury during its inquiry, which they severally read and then discussed; and error is now predicated on a ruling of the county judge which denied the accused access to and inspection of the transcript for use in the cross-examination of the witnesses whose testimony was so recorded.

The transcript was then among the prosecutor's possessions in the courtroom, and so readily available. His response to the demand for inspection was that if counsel, on "cross-examination, intends to use some of the evidence from the State, if counsel will offer the same into evidence I will stipulate and offer the same to go into evidence"; and the county judge finally overruled counsel's demand for inspection and also the prosecutor's later "offer" of the transcript on the ground that he was "not asked to offer it." The grand jury testimony was given some two years after the events under inquiry.

Conceding that these witnesses "refreshed their recollection by reading their own testimony previously given before the Grand Jury," the State nevertheless insists that the "witnesses not having refreshed their respective recollections while on the stand testified from their independent memories," and so the accused "had no right to inspect, for any purpose, the memoranda so used."

It is affirmed that none of the witnesses "required the transcript to refresh his recollection"; that "it is perfectly

proper for a witness to refresh his recollection out of court,"
even by referring to grand jury testimony previously given,
but "while an opponent is entitled to examine and cross-
examine on a memorandum used on the stand by a witness
to refresh his recollection he has no such right where the
witness testified from his independent recollection while on
the stand although his memory was refreshed prior to coming
to court," invoking the rule of *State v. Kwiatkowski,* 83
*N. J. L.* 650 (*E. & A.* 1912). The State also cites to this
end *State v. Martin,* 94 *N. J. L.* 139 (*E. & A.* 1920), which
relied upon *Myers v. Weger,* 62 *N. J. L.* 432 (*E. & A.*
1898); *State v. Dougherty,* 86 *N. J. L.* 525 (*Sup. Ct.*
1915); *State v. Magers,* 36 *Or.* 38, 58 *P.* 892 (*Sup. Ct.*
1899); *Lennon v. United States,* 20 *F. 2d* 490 (8 *Cir.*
1927); *State v. Paschall,* 182 *Wash.* 304, 47 *P. 2d* 15
(*Sup. Ct.* 1935), all holding that where the witness' memory
had been refreshed by reference to shorthand notes or other
writing before going upon the witness stand, and "all the
facts were so revived in his mind that he was qualified and
capacitated to testify to them [and did so testify] from
his own knowledge and recollection, independently of the
notes." *State v. Magers, supra,* there was no right
to the production of the writing for inspection and
use on cross-examination of the witness. In *Kwiatkowski,*
the old Court of Errors and Appeals held that a witness
"may, if he chooses, refresh his memory out of court by
reading a memorandum made by himself of and concerning
the incident to which he is about to speak on the witness-
stand, and the testimony thus given will be unimpeachable
so far as the manner of refreshing his recollection is con-
cerned." And in *State v. Paschall, supra,* it was said that
in such circumstances, citing 5 *Jones, Commentaries on
Evidence* (2d ed.), *sec.* 2387, "memoranda used outside of
court need not be brought into court, since the witness in
theory finally testifies from his own recollection"; it "is not
the memorandum which speaks, but the recollection of the
witnesses"; but if it develops on cross-examination "of the
witness or otherwise, that, outside of court, he has refreshed

his memory, the failure to produce such memorandum may go to the credibility of the witness."

But the one case is as compelling in reason and logic as the other. The essence of the principle is the opponent's protection against "the risk of imposition and false aids," to use the language of Dean Wigmore in his work on *Evidence* (3*d* ed.), *section* 762, by inspection of the notes or writing used by the witness to refresh his memory and revive his recollection and his cross-examination to test the trustworthiness of his testimony; and it is but just and right to this end that the rule apply to writings so used by the witness before trial as when the refreshment is thus had while he is on the stand. If the "failure to produce such memorandum" be a just consideration on the issue of "the credibility of the witness," then is not cross-examination of the witness aided by the writing itself a more certain measure to the same end? Why should the opponent be deprived of this means of testing the factual basis for the "theory" of testimony given from the "independent recollection [of the witness] while on the stand," and of inquiring whether the memorandum is being used as evidence apart from recollection under the pretense of refreshment, or otherwise bears upon the credibility of the witness? It cannot be that the witness' *ipse dixit* as to present recollection revived is itself conclusive of the fact. And the refreshment here was had the day the testimony was given, prior to the opening of court, and included a discussion among the witnesses themselves. In these circumstances, the distinction is purely artificial. Professor McCormick says that "the public interest in the full disclosure of the source of a witness's testimony seems a weightier consideration" than discouraging "prying into the opponent's file, * * *." *McCormick on Evidence, section* 9. See *Myers v. Weger, supra.*

Said Eyre, L. C. J., in *Hardy's Trial,* 24 *How. St. Tr.* 824 (1794):

"It is always usual and very reasonable, when a witness speaks from memorandums, that the counsel should have an opportunity of looking at those memorandums, when he is cross-examining that witness."

And Ellenborough, L. C. J., observed in *Henry v. Lee,* 2 *Chitty,* 124 (1810):

> "If upon looking at *any* document he can so far refresh his memory as to recollect a circumstance, it is sufficient; and it makes no difference that the memorandum is not written by himself; for it is not the memorandum that is the evidence but the recollection of the witness."

In a later case, *Gregory v. Taverner,* 6 *C. & P.* 281 (1833), Gurney B. laid it down thus:

> "The memorandum itself is not evidence, and particular entries only are used by the witness to refresh his memory. * * * The defendant's counsel may cross-examine on the entries already referred to, and the jury may also see those entries if they wish to do so."

In this country the basic rule is the same:

> "The opposite party is entitled to cross-examine the witness in regard to it; and it may be shown to the jury, not for the purpose of establishing the facts therein contained, but for the purpose of showing that it could not properly refresh the memory of the witness." *Commonwealth v. Jeffs,* 132 *Mass.* 5 (*Sup. Jud. Ct.* 1882), *Endicott, J.*

And L. Hand, J., said in *United States v. Rappy,* 157 *F.* 2d 964 (2 *Cir.* 1946):

> "When a party uses an earlier statement of his own witness to refresh the witness's memory, the only evidence recognized as such is the testimony so refreshed; and the party may not put the statement in evidence, although the other side may do so, and apparently the jury may call for it, *sua sponte.* 3 *Wigmore, section* 763."

Compare *Smith v. Jackson,* 113 *Mich.* 511, 71 *N. W.* 843 (*Sup. Ct.* 1897); *Luse v. United States,* 49 *F.* 2d 241 (9 *Cir.* 1931); *Shear v. Rogoff,* 288 *Mass.* 357, 193 *N. E.* 63 (*Sup. Jud. Ct.* 1934); *Miller v. Borough of Exeter,* 366 *Pa.* 336, 77 *A.* 2d 395 (*Sup. Ct.* 1951).

These considerations serve to modify the rule of *State v. Brooks,* 136 *N. J. L.* 577 (*E. & A.* 1948), bringing to

bear civil procedural policy under other and different circumstances, exemplified in *Ellison v. Cruser,* 40 *N. J. L.* 444 (*Sup. Ct.* 1878), and *Decker v. George W. Smith & Co.,* 88 *N. J. L.* 630 (*E. & A.* 1916), a practice we have no occasion now to consider. See *Goodman v. Lehigh Valley R. Co.,* 82 *N. J. L.* 450 (*E. & A.* 1911); also *State v. Zamofsky,* 105 *A.* 71 (*Sup. Ct.* 1918).

The paper used to revive recollection need not be one "drawn up *about the time* of the events"; the "instance which is at once the plainest test of principle and the most common in practice is that of a *deposition* or a report of *prior testimony*"; "Here the document was certainly not made at or near the time of the events observed; but orthodox practice has always conceded that the witness may refer to it to refresh his memory; either on direct examination or on cross-examination"; the "rulings in which this has been refused have apparently been influenced more or less by the apprehension that thereby the counsel, when a cross-examiner, might evade the rule (*post, section* 1018) which forbids the witness' prior contradictory statements to be introduced as independent testimony, or that the counsel on a direct examination might evade the rule (*post, section* 902) against impeaching one's own witness by his contradictory statements," the evasion of either of which by the pretext of refreshment may be thwarted by the judge. *Wigmore, section* 761.

Dean Wigmore affirms, *section* 762, that "* * * as by this opportunity of *inspection* the opponent is guarded against imposition clearly apparent, so by *cross-examination* based on the paper he may further detect circumstances not appearing on the surface, and may expose all that detracts from the weight of testimony," citing *Sinclair v. Stevenson,* 1 *C. & P.* 582 (1824); *Gregory v. Taverner, supra; Palmer v. McLear,* 1 *Sw. & Tr.* 149 (1858); *Commonwealth v. Jeffs, supra; Taylor v. United States,* 19 *F.* 2d 813 (8 *Cir.* 1927); *Litlle v. United States,* 93 *F.* 2d 401 (8 *Cir.* 1938), where an agent of investigation, testifying for the prosecution, refreshed his memory from notes of interviews had

with the accused, and on demand for inspection disclosure was compelled. And the "small minority" view is dismissed, *section* 762, as having "no principle to support [it]," led away, in most instances, by "perceiving the general distinction between a record of past recollection and a paper reviving present recollection, and by concluding that, because the rule about producing originals applies to the former (*ante, section* 749) but not to the latter (*ante, section* 760), therefore it is unnecessary to produce and show the paper to the opponent."

And, it is urged, *section* 762, the rule should apply to "a memorandum *consulted* for refreshment *before trial* and not brought by the witness into court; for, though there is no objection to a memory being thus stimulated, yet the risk of imposition and the need of safeguard is just as great"; "It is simple and feasible enough for the court to require that the paper be sent for and exhibited before the end of the trial."

The cases *pro* and *con* are cited, our own *State v. Kwiatkowski, supra,* among the latter, with the observation that the precise point was not there raised.

And, finally, it is there said, *section* 763, that "though the witness' party may not present [the writing] as evidence, the same reason of precaution which allows the opponent to examine it [*ante, section* 762] allows the *opponent* to *call the jury's attention* to its features, and also allows the jurymen, if they please, to examine it for the same end"; "In short, the *opponent,* but not the offering party, *has a right to have the jury see it";* also "That the *offering party* has not the right to treat [the paper] as evidence, by reading it or showing it or handing it to the jury, is well established," citing *Springer v. Labow,* 108 *N. J. L.* 68 (*Sup. Ct.* 1931), and "That the opponent may do this, or that the jury may of its own motion demand it, is equally conceded."

It goes without saying, as this treatise on evidence suggests, *section* 765, that the ruling principle involves the exercise of a sound discretion to serve essential justice as against a

dogmatic and "overstrict" enforcement not conducive to that end.

In the circumstances, there was prejudicial and reversible error in the refusal to allow inspection of the testimony thus given to the grand jury and its use in cross-examination of the witnesses.

Reversed and remanded for a new trial.

WEINTRAUB, C. J. (concurring). I agree the trial court properly restricted the proof purportedly offered to support defendant's alibi, and this for the reason that the offer had no probative force. None of the witnesses could place defendant at the trailer camp at any of the times the State's witnesses placed him elsewhere. As I read the record, the trial judge stated his ruling did not apply to testimony which would either directly or by fair inference clash with the State's case. Even before us, counsel for defendant was unable to say that any witness he would have produced could thus have furthered the inquiry.

But I question the wisdom of enunciating a broad principle that one charged with crime may be limited with respect to the number of witnesses he may produce as to any fact however vital the fact may be, even with the *caveat* of the majority opinion that "Care must be exercised to avoid an undue intrusion upon the substantial right of the accused in a criminal case to a fair trial." At the moment I cannot conceive of a situation in which I would approve of a limitation with respect to a substantial fact which the State asserts or will not concede, and hence I would await a concrete set of facts before venturing agreement or disagreement with the abstract proposition. I am sure that in any event the situations in which that course would be upheld would be extremely rare. The issue thus seems to me to be virtually academic at best; and if this appraisal is correct, the adoption of the broad proposition, unanchored to luminative facts, is but an invitation to trial error.

In all other respects I join in the majority opinion.

WACHENFELD, J. (dissenting in part). For the first time, and in my view unnecessarily, we are deciding the important question of whether the witnesses produced by a defendant at a criminal trial in support of his substantive denial of the charge made against him can be limited in number by the trial judge.

The facts *sub judice* do not provoke this question. The testimony given by Mucci's so-called alibi witnesses was irrelevant. They could not place the defendant in the trailer park at the specific times when the overt acts were allegedly committed in Hackensack. Mucci's counsel admitted as much. Nevertheless, the majority eschews using the time-honored ground of lack of relevancy as the basis for its decision and expansively holds that:

"There can be no doubt as to the power as thus confined; the 'right, within reasonable limits, to restrict the number of witnesses to be examined as to any one point or fact' is essential to the due course of justice."

This promotes the simple yet portentous inquiry: can a man's defense on the merits in a criminal trial be restricted in the discretion of the trial judge?

The majority, in substance, says it can as a matter of sheer expediency and convenience. I cannot agree.

It is decided that this matter "calls for the exercise of a sound discretion in the context of the circumstances of the particular case." This is fundamental to any trial court ruling at any time and anywhere, if discretion is involved. The majority statement is not, however, a novel formula which can automatically dissolve the defendant's right to have his witnesses heard. In a particularly sensitive and significant area, it lends itself to varying interpretations which inevitably will produce discrimination in treatment. Where does sound discretion ·end and violation of constitutional guarantees begin? The majority concedes that "the cumulation of testimony in relation to the substantive issues may bear upon the ultimate quality and weight of the evidence * * *."

Any limitation of the number of witnesses upon a central issue infringes upon the defendant's opportunity to prove his right to freedom. Liberty is too precious a commodity to be hazarded, over objection, to one man's judgment or caprice; hence the trial by jury, the cornerstone of our bill of rights.

Better that a little judicial time be consumed than to trespass upon the principle of untrammeled defense which has been the shining example of our jurisprudence and a lofty inspiration throughout the world.

The ringing challenge of Patrick Henry, "Give me liberty, or give me death," has winged down the corridors of time and held the admiration of all the American people. It accentuates a cardinal principle whose force should not be diminished by a vague judicial phrase susceptible of widely differing interpretations by different judges.

There was no compromise then—there should be none now. Under our constitutional concepts, a day in court means a full day, and the right to curtail it has not been granted to anyone.

There is a vast amount of authority denying the power of a trial court to limit the number of witnesses to be heard as to a controlling fact, or facts and circumstances bearing thereon. *People v. Arnold, 248 Ill. 169, 93 N. E. 786 (Ill. Sup. Ct. 1911).* In *Village of South Danville v. Jacobs, 42 Ill. App. 533 (App. Div. 1891),* the court said:

"We are aware of no rule authorizing the court to limit the number of witnesses a party may introduce unless it be upon some question collateral to the main issue * * *."

While in *Henson & Sons Coal Co. v. Strickland, 152 Ark. 203, 238 S. W. 5, 21 A. L. R. 328 (Ark. Sup. Ct. 1922),* the court expressed itself in unmistakable language:

"It is a well-settled principle of constitutional law that no person shall be condemned without a hearing, and that everyone who is by process called into court in any matter affecting his interests has an absolute right to be heard. * * *"

Reiterating the same thought with a different linguistic approach, in *St. Louis, Memphis & S. E. R. Co. v. Aubuchon,* 199 *Mo.* 352, 97 *S. W.* 867, 9 *L. R. A., N. S.,* 426 (*Mo. Sup. Ct.* 1906), the court, in reversing a judgment, said:

"* * * If, then, the trial judge may, without any cause shown project his will arbitrarily into the number of witnesses on the crucial point in the case, he may by that token entirely foreclose the weight of the evidence, and thus indirectly do what he may not directly do, to wit, interfere in a realm where the jury reign supreme."

I regret the recognition in New Jersey of a " 'right, within reasonable limits, to restrict the number of witnesses to be examined as to any one point or fact.' " It is an invasion of the right to trial by jury; a curtailment of the right to a full day in court; and a trespass upon any reasonable conception of what constitutes fundamental fairness.

Other than as here noted, I concur in the result.

WEINTRAUB, C. J., and WACHENFELD, J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS and FRANCIS—6.